553 So.2d 8 (1989)
Othie Lee WEST
v.
STATE of Mississippi.
No. DP-88.
Supreme Court of Mississippi, En Banc.
October 4, 1989.
*10 Merrida P. Coxwell, Jr. and Robbin Wilson Cook, Stanfield Carmody & Coxwell, Jackson, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., and Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En banc.
ROBERTSON, Justice, for the Court:

I.
This is a rather bizarre capital murder case in which the prosecution sought to prove that the defendant shot and mortally wounded his female victim and then sexually assaulted her. In spite of a comprehensive defense discovery request and a prosecution promise that the testimony of its principal expert witness, a pathologist/psychiatrist, would be limited to that at defendant's first trial, the prosecution on the third day of trial offered through this expert a free floating lecture on a psychosexual disorder he labeled necrophilia.
Moreover, this expert opinion testimony was never tied to the defendant whose behavior was at issue, nor was it offered with reasonable certainty given the state of knowledge in the field. As such the evidence was inadmissible. The point is important for without the sexual assault the defendant may not lawfully be exposed to the death penalty, and the prosecution's proof there is otherwise problematical. Because the trial court overruled the defense objection to the necrophilia testimony, we must reverse and remand for a new trial.

II.

A.[1]
On June 5, 1983, Otha (Othie) Lee West was eighteen years old and was living with his mother and nine-year-old brother in an upstairs apartment in the Lincoln Garden Apartments Complex in northwest Jackson. He had completed twelve years of formal education and was generally a C or D average student in high school. On the same day, Mary Ann Brim, age 54, was living in a ground floor apartment with her common-law husband of fifteen years, Theodore Lee.
In the evening before the sun had set, a number of neighborhood children were congregated in a playground area near the apartment building. They witnessed an argument between West and Brim taking place on Brim's front stoop. As the children watched, West ran to his upstairs apartment using the exterior stairway. He soon returned, circling the building before making his way back to Brim's front door, a black revolver in his hand. As Brim looked out her door, West forced his way into the apartment, closing the door behind him. Gunfire and a scream followed moments later.
Officer Charlie Hedgepeth of the Jackson Police Department was patrolling nearby when he received a radio dispatch at approximately 7:30 P.M., reporting that shots had been fired at the Lincoln Garden Apartments. He responded to the call within two or three minutes. Theodore Lee arrived at the same time as Officer Hedgepeth, and assisted the officer's entrance to *11 Brim's apartment, as the front door was locked. Hedgepeth and Sergeant Freddie Weeks entered the apartment ahead of Lee and found Brim's body lying on the living room floor, clothed only in a blouse, which had been pulled up revealing her breasts and a single bullet wound to the chest. Her slacks and panties were found next to the body. Brim had apparently been sexually assaulted. Six inches to the right of her head a bullet hole had pierced the linoleum floor. A flattened slug was found next to the body. A .38 caliber revolver had been placed upon a credenza located at the foot of the body.
A few seconds later, Hedgepeth heard a noise coming from a bedroom. He approached and shouted "Freeze! Police!" He then heard the sound of breaking glass. Levin Jones, one of the children who was playing outside in the area, saw West crash through the rear window and begin to flee. Hedgepeth rushed into the bedroom, climbed out the window, and pursued north toward Moonbeam Street. Hedgepeth saw his suspect enter a lounge known as the "CB 40 Club", located some 500 yards from the apartments. Sergeant Weeks also pursued on foot and, after Weeks had reached the lounge, the two policemen entered.
Inside the lounge, the officers found West sitting at a table, sweating and panting. He was placed under arrest and taken to the precinct station. Later, West was transported back to the apartments and identified by the eyewitnesses as the man who had forced his way into Brim's apartment.

B.
This criminal prosecution was formally commenced on March 5, 1984, when the Grand Jury of the First Judicial District of Hinds County, Mississippi, charged West with the capital murder of Mary Ann Brim, citing as the underlying felony that West had committed the crime of sexual battery against the person of Mary Ann Brim. Miss. Code Ann. §§ 97-3-19(2)(e) and -95 (Supp. 1989). West was brought to trial in the Circuit Court of Hinds County some two months later whereupon he was convicted of capital murder and sentenced to death. On December 4, 1985, this Court found reversible error in those proceedings, vacated West's conviction and sentence, and remanded for a new trial. West I, 485 So.2d at 682, 690.
On November 9, 1987, West again stood trial and once more the jury convicted West of capital murder and sentenced him to die. This appeal has followed.

III.
There is a point at the outset which should be noted, but need not detain us. Othie Lee West testified in his defense and completely denied the charges against him. West stated that on the afternoon in question he played pool with friends, drank a few beers thereafter and then watched a parade. After the parade he went back to his apartment to pick up some cigarettes and then went to the CB 40 Club. The reason he was out of breath and perspiring when the officers came in was "because I had been dancing."
The witnesses for the prosecution testified quite to the contrary, as noted above. Suffice it to say that the evidence that West killed Brim is supported by more than substantial evidence and is well beyond our authority to disturb. See, e.g., Layne v. State, 542 So.2d 237, 239 (Miss. 1989); Wash v. State, 521 So.2d 890, 896 (Miss. 1988); McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987); Fisher v. State 481 So.2d 203, 212 (Miss. 1985). Whether West killed Brim while engaged in the commission of the crime of sexual battery is another matter to which the great bulk of the remainder of this opinion is directed.

IV.
West argues that the evidence before the jury on the matter of the underlying felony of sexual battery was legally insufficient to support a verdict and that, accordingly, he should stand acquitted of the charge of capital murder, subject to retrial only for murder. In view of the evidentiary insufficiency he perceives, West insists he is entitled to double jeopardy protection from retrial on a charge of capital murder and, *12 more importantly, that he is entitled to double jeopardy protection from exposure to the death penalty. West predicates the point on his notion that the evidence shows beyond doubt that Brim was dead prior to the sexual assault and, accordingly, that she was not a "person" upon whom sexual battery could be committed.
The proof adduced at the second trial regarding the commission of a sexual battery was essentially the same as that presented in the first. The police collected an unknown fluid discovered underneath the body near the vaginal opening. Serological tests revealed that the substance was not seminal fluid. Dr. Galvez testified that he recovered a sticky substance from the body, outside the vaginal cavity. Serological tests upon that substance were not introduced into evidence.
A "vaginal wash" collected during the autopsy revealed the presence of sperm and residual seminal fluid. Serological testing revealed secretor substances consistent with Mary Ann Brim's blood type only. The serologist deduced from this information that the person depositing the sperm was either (a) a secretor and of the same blood type as Brim or (b) a non-secretor. Since West is a non-secretor, he could not be excluded as the source of the sperm and seminal fluid. Dr. Rodrigo Galvez, pathologist, and, Deborah Butler, the State Crime Lab serologist, each concluded that the presence of sperm indicated that the victim had experienced "recent" sexual intercourse before her death. The time-frame in which intercourse took place could not be further narrowed, however, as spermatazoa can survive for as long as seventy-two hours after ejaculation.
The prosecution introduced the testimony of Theodore Lee, Brim's common law husband, to rebut any inference that he may have been the source of the sperm and semen found in the vaginal cavity of the victim. Although Lee could not remember where he lived in 1983, nor could he remember being interviewed by defense counsel four days earlier, he stated unequivocally that he had not engaged in intercourse with Brim for three or four days before her death. On cross-examination, Lee admitted that, in truth, he could not remember when he last engaged in sexual relations with Brim prior to her death.
Each party produced expert pathology testimony to show how swiftly the victim died from the bullet wound. Dr. Galvez testified that his autopsy of the body of Mary Ann Brim revealed a single gunshot wound to the chest which had pierced the right atrium and exited through the left ventricle of her heart. He said that the trajectory of the fatal bullet had followed was in a generally downward path, from the front to the back of the victim. Dr. Galvez had no opinion as to Brim's position when shot  whether she was on her knees or even whether she was facing her assailant at the time. Such a chest wound, Dr. Galvez testified, would cause the heart to immediately cease pumping, rendering the victim unconscious within a second or two. Dr. Galvez was quick to point out, however, that the irreversible changes to the brain normally associated with death would not have occurred for five minutes, even after so traumatic a wound.
The Circuit Court denied West's evidentiary point, and this Court's opinion in West I, stated "if it was a jury case in the first trial, it's a jury case in the second trial". This view  that a jury issue in the first trial is a fortiori a jury issue in the second trial  is clearly wrong. A trial after remand is a trial de novo in every sense. Johnson v. State, 529 So.2d 577, 579 (Miss. 1988). Where, as here, the evidence varies from that presented in the first trial, the circuit court should examine the evidence independent of what previously transpired. Gibson v. State, 503 So.2d 230, 232 (Miss. 1987).
First, as to West's contention that there was evidence insufficient to establish that a sexual assault occurred or to identify the defendant as the perpetrator, the point has been addressed in McFee v. State, 511 So.2d 130 (Miss. 1987). There the court affirmed a rape conviction founded upon less physical evidence than that presented to the jury in today's case. In McFee, *13 evidence of vaginal bruising found on a murder victim, together with a less-than-conclusive pubic hair match implicating the defendant was considered sufficient to support a conviction for rape. 511 So.2d at 134. The Court placed great emphasis upon evidence that placed the defendant at the scene of the murder. "It may well be ... that there are many other men whose pubic hairs possess the same characteristics as that found on the victim's body; yet, there is no evidence in the record that any of those others were present ..." in the victim's home. Id. at 134.
Next, West argues that Brim was dead at the time of the sexual assault. He says the evidence shows Brim was "dead" almost immediately after his entry into the apartment, citing Miss. Code Ann. § 41-36-3 (Supp. 1981) which reads as follows:
An individual who has sustained either (a) irreversible cessation of circulatory and respiratory functions or (b) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards. [Emphasis added]
West I also relies on this statute. 485 So.2d at 685.
To establish the felony underlying the capital murder charge, the prosecution relies on our sexual battery statute which reads:
A person is guilty of sexual battery if he or she engages in sexual penetration with:
(a) Another person without his or her consent.
Miss. Code Ann. § 97-3-95 (Supp. 1980) (emphasis added). Of course, if the person is dead, she is no longer a "person" for purposes of the statute and there can be no sexual battery, or so West's reasoning proceeds. The argument has a certain logical allure, although West is hard-pressed to cite to any authority for it.
We have found cases in other states which reason that, because the use of force is an essential element to the crime of rape, the use of deadly force, if done with the intent to coerce the victim into engaging in a sexual act, satisfies the factual nexus between the killing and the underlying felony to elevate the killing to a capital crime. The California Supreme Court rejected a theory identical to West's on the ground that such a result would appear to reward the use of deadly force. The court concluded:
Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder.
People v. Goodridge, 70 Cal.2d 824, 76 Cal. Rptr. 421, 429, 452 P.2d 637, 645 (1969); see also State v. Brobeck, 751 S.W.2d 828, 832 (Tenn. 1988); Lipham v. State, 257 Ga. 808, 364 S.E.2d 840, 842 (1988); Commonwealth v. Tarver, 345 N.E.2d 671, 679 (Mass. 1975).
Mississippi law accepts a "one continuous transaction" rationale in capital cases. In Pickle v. State, 345 So.2d 623 (Miss. 1977), we construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached... ." 345 So.2d at 626; see also Layne v. State, 542 So.2d 237, 243 (Miss. 1989); Fisher v. State, 481 So.2d 203, 212 (Miss. 1985); and Culberson v. State, 379 So.2d 499, 503-04 (Miss. 1979). There is certainly evidence in this record from which the jury could have found Brim alive when West's assault reached this point. An indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony. E.g., Neal v. State, 451 So.2d 743, 757-58 (Miss. 1984); Pruett v. State, 431 So.2d 1101, 1104-05 (Miss. 1983). The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge.

V.

A.
At trial the prosecution presented Dr. Rodrigo Galvez who is board certified in *14 pathology and psychiatry. Dr. Galvez first explained to the jury his findings from the autopsy he performed on Brim's body and offered his opinion that she had died of the bullet wound to the chest and had also had a recent sexual encounter. Coupled with the eye witness accounts of what happened on the evening of June 5, 1983, this fleshed out a factual scenario in which West had shot Brim, rendered her unconscious and dying, and had then sexually assaulted her.
At this point the prosecution chose to elicit testimony from Dr. Galvez respecting his other field of expertise  psychiatry.
Q. [BY MS. HEWES] Now, Dr. Galvez, I want you to switch professions here just a second and put on your psychiatrist's hat. Can you tell us whether or not there is a term for people who seek out or enjoy sex with people that are dead or they believe they're dead?
Defense counsel objected, first, on grounds of relevancy and, second, on grounds of discovery violation. Outside the presence of the jury, the Court heard the substance of the psychiatric testimony the prosecution intended to introduce, which concerned a psychosexual disorder Dr. Galvez labeled "necrophilia". This occurred at approximately 10:00 in the morning. The Court took a thirty minute recess whereupon it considered and overruled West's relevancy objection, the witness remaining subject to later recall by the defense for cross-examination on that topic. During this time defense counsel was given the opportunity to interview Dr. Galvez.
Dr. Galvez' testimony concerning necrophilia was then presented to the jury:
Q. Now, Dr. Galvez, directing your attention to your expertise in the field of psychiatry, can you tell me whether or not in your studies of the field  in the field of psychiatry you have determined whether or not there is a term for individuals who seek or enjoy sex with persons that they believe to be or who are dead?
A. Yes, there is a term.
Q. And what do you call that?
A. Necrophilia.
Q. Are there degrees of necrophilia?
A. Yes, there are different degrees of necrophilia.
Q. Could you explain some of that to the ladies and gentlemen?
A. Yes. There are degrees from the very mild ... when  and I will explain to the Court and to the jury  right before making love, before having sex, one of them may tell the other one, "Take a shower  cold shower. Lay down on bed. Be as still, as stiff, don't breathe even." This is very mild, very mild, okay?
Q. That's a mild form of necrophilia 
A. Mild form. To the most severe that some of them, they seek special jobs or work and they go to work in a funeral home, see? I don't mean that everybody that works in a funeral home does have the same problem, but some of them  occasionally, somebody will get a job there and when he's alone with one of the bodies will have sex because it's a way they get some pleasure. There are other more severe types or forms. They go to the cemetery and dig  dig out a body and they have sex with a body. It doesn't  but there are degrees, from the very mild, innocent to the more severe and  and gruesome, if you will.
Q. Dr. Galvez, can you tell us then in the field of psychiatry and your studies what you have learned with respect to why it is that someone would want to have sex with an individual who's dead or totally physically incapacitated?
A. Yes. Usually the individual, they have a psychic conflict. The main conflict is control and what is the ultimate control, you know. Control life and absolute control of a dead body. "I can do whatever I want to. I can go as far as I want to." The body will not respond or react in any way. Is the final, the ultimate control, okay?
Q. All right. The desire to control, can you tell me whether or not that's characteristic of all forms of sexual assault?
A. In sexual assault, in rape, control is the main issue. Control and  and terrorize the victim. The sexual gratification *15 is achieved by absolute control and if a woman or the victim  it can be a child or a man  is terrorized, then it will be extremely gratifying for them, yes.
Q. But what is the ultimate form of control over a victim of sexual assault?
A. Yes, is death. Death. There's nothing beyond death. Once you kill somebody, that is it.
Q. Can you tell me, combining your fields of psychiatry and pathology, whether after that gunshot wound was inflicted to Mary Ann Brim's body whether or not she was totally physically incapacitated?
A. Yes, she was.
The Circuit Court then recessed for lunch.
We consider the admissibility of Dr. Galvez' necrophilia testimony on two separate grounds. The first concerns the defense charge of a discovery violation and inadequate curative action by the Circuit Court. Second, we consider whether the prosecution provided a predicate adequate that this testimony be presented to the jury.
As will presently appear, substantial error appears on each of these grounds, requiring reversal.

B.

Discovery
The prosecution first questioned Dr. Galvez on the subject of necrophilia at approximately 10:00 o'clock on the morning of the third day of trial. Upon defense objection, the jury was excused and the Court listened to Dr. Galvez's proffered testimony, in question and answer form. The Court then overruled West's relevancy objection but expressed concern on the discovery point. The prosecution, however, was allowed to present Dr. Galvez direct testimony on necrophilia before the noon recess.
At approximately 2:25 in the afternoon defense counsel moved for an additional continuance in light of evidence they contend is a surprise to them. It's taken me awhile. I was not able to reach Dr. Stanley, but I was able to reach Dr. Guild[[2]] and I discussed this matter with him and he said it would take him some while  some time, twelve to twenty-four hours to give me any information on this point that Dr. Galvez has testified to ... today.
Defense counsel announced, "We are not able to go forward at this time," and moved also for a mistrial. The Court denied the motion for mistrial and directed that the cross-examination of Dr. Galvez on all other points be completed at that time, advising counsel that more time would be allowed for preparation to cross-examine Dr. Galvez on the necrophilia issue. The Court then reconvened and Dr. Galvez's cross-examination took place on other issues and, as well, several other prosecution witnesses testified and the Court finally adjourned at 5:13 in the afternoon.
When the Court convened the next morning, defense counsel requested more time. "I would at this time request until 1:00 to go out and talk to Dr. Guild and Dr. Stanley." The Court granted the request. The Court reconvened at 1:08 in the afternoon whereupon defense counsel announced
We are not going to have any questions during cross-examination of Dr. Galvez on the psychiatric portion of his testimony, but would again raise the objections that I raised previously [on grounds of relevancy and discovery violation] and request a mistrial... . [Emphasis supplied]
*16 Defense counsel then stated further objections. The Court denied the motion and ordered the trial to proceed.
A further pre-trial context is important. On August 10, 1987  some three months before trial, West filed an extensive discovery request, a page and a half of which pertained to Dr. Rodrigo Galvez and is directed toward Dr. Galvez's role as a pathologist. Not surprisingly, the discovery request makes no mention of necrophilia or Dr. Galvez's role as a psychiatrist. It does include a catchall request for all evidence and information that came into possession of Galvez regarding the victim, Mary Ann Brim, or the defendant, Othie Lee West, not heretofore enumerated.
There appears in the record no order acting on this motion for discovery, although, of course, our cases have held that no order is necessary, at least insofar as the request pertains to matters discoverable within Rule 4.06(a). See, e.g., Inman v. State, 515 So.2d 1150, 1153 (Miss. 1987). What obligated the prosecution to make pre-trial disclosure of Dr. Galvez' necrophilia testimony, however, was the prosecution's pre-trial representation to defense counsel that Dr. Galvez' testimony would not exceed the scope of what was offered at the trial of West I. In his brief on appeal, West states that
The prosecution in response to the defendant's request for discovery had advised West that they would use the same evidence used at West's prior trial.
The prosecution does not deny or comment on this in its brief.[3] There was further pre-trial wrangling regarding the testimony of Dr. Galvez in the context of testimony he had offered at West's first trial but which had been criticized by this Court in its opinion reversing. West I, 485 So.2d at 686. On November 10, 1987, the Circuit Court ordered that Dr. Galvez not discuss "defense wounds" or characterize or describe any wounds found on the victim, Mary Ann Brim, as "defense wounds". Subject to this order, the prosecution approached trial limited in the testimony it could adduce through Dr. Galvez to that presented at West's first trial, provided only that the prosecution was bound to disclose to defense counsel any further evidence far enough in advance of trial to afford the defense a meaningful opportunity to prepare for rebuttal. Inman v. State, 515 So.2d 1150, 1153 (Miss. 1987); Stewart v. State, 512 So.2d 889, 892 (Miss. 1987).
The prosecution's response is two-fold. First, we are told that Dr. Galvez made no examination of the defendant on this issue and, more importantly, had prepared no report or other writing concerning the matter and, therefore, "there was nothing to produce in discovery." Second, the prosecution argues "this seems to be a spontaneous line of questioning the [trial] prosecutor chose to explore with this witness."
The fact that Dr. Galvez had furnished no written report is not grounds for non-disclosure. In other contexts where written statements or reports were discoverable, we have held that the duty to make discovery extends to unwritten statements and reports as well. See Nixon v. State, 533 So.2d 1078, 1089 (Miss. 1987); Smith v. State, 530 So.2d 155, 158 (Miss. 1988); cf. Cousan v. State, 543 So.2d 177, 179 (Miss. 1989) (tape recordings). Were the rule otherwise, a party would be able to avoid discovery simply by not reducing otherwise discoverable materials to writing and thus thwart the fair trial purposes of the discovery rules.
Second, the fact that the prosecution itself may not have known of the necrophilia issue at the time of the original disclosure that it would rely on the same testimony Dr. Galvez gave at the first trial is of no moment. The prosecution had a continuing duty to make discovery of "additional *17 material or information which is subject to disclosure" which a party becomes aware of "subsequent to compliance with these rules or orders pursuant thereto." See Rule 4.06(e), Miss.Unif.Crim.R.Cir.Ct. Prac. We have recognized and enforced the continuing nature of the duty to make discovery. See Stewart v. State, 512 So.2d 889, 891-92 (Miss. 1987); Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986); Acevedo v. State, 467 So.2d 220, 224 (Miss. 1985); Box v. State, 437 So.2d 19, 25 (Miss. 1983) (Robertson, J., specially concurring). That the prosecution fails to unearth certain evidence until the last minute hardly eviscerates the prejudice to a defendant caught unaware, nor the necessity for reversal where the circuit court denies the defense request for a reasonable continuance. Stewart v. State, 512 So.2d at 891-92; Foster v. State, 484 So.2d at 1011. Cole v. State, 525 So.2d 365 (Miss. 1987), concerns a witness the prosecution discovered in mid-trial and thus presents a quite analogous situation. The Court affirmed in Cole, not because the prosecution had any immunity from disclosure of matters discovered at the last minute or even during trial, but because defense counsel failed to request timely a continuance, a procedural deficiency not present here. Cole, 525 So.2d at 367-68.
The Mississippi case touching most directly upon this issue is Acevedo v. State, 467 So.2d 220 (Miss. 1985). In that criminal prosecution, the defense was provided with reports prepared by a firearms expert pursuant to Rule 4.06. The conclusions drawn from the raw data by the expert were equivocal. Sometime after the reports were provided, however, the prosecution expert significantly modified his conclusions, but the defendant was not notified. At trial, the defense objected to the varying testimony, claiming surprise at the witness's deviation from his written conclusions. The objection was overruled.
This Court reversed in Acevedo, holding that the prosecution had "violated its continuing duty to supplement discoverable matters with newly discovered material or information" under Rule 4.06(e). Acevedo, 467 So.2d at 224. Noting that the defendant would have had the opportunity to rebut directly the expert's conclusions had he known of them, the Court concluded that the prosecution's discovery violation "was beyond the power of correction by cross-examination, since defense counsel had no notice or opportunity to prepare for an effective cross-examination." Acevedo, 467 So.2d at 224.
Acevedo controls today. Having revealed that Dr. Galvez would testify as a pathologist, and having represented to defense counsel that Dr. Galvez's testimony would not exceed the scope of that offered at West's first trial, the prosecution's continuing duty to supplement required reasonable advance advice of any new areas Dr. Galvez would touch upon. As in Acevedo, the prosecution's failure to apprise the defense of this new testimony effectively deprived the accused of both an effective cross-examination of the expert and greatly restricted his opportunity to present contrary expert opinion.
We hold that the prosecution in the case at bar violated its duty to provide West pre-trial discovery of Dr. Galvez' necrophilia theory.[4] Our question then becomes *18 whether the Circuit Court's remedial measures were adequate to preclude reversal.
We turn to the procedure first outlined in Box v. State, 437 So.2d 19, 23-24 (Miss. 1983) (Robertson, J., specially concurring), and recently restated in Houston v. State, 531 So.2d 598 (Miss. 1988):
The essence of that procedure is that, where faced with a discovery violation, technical or otherwise, in a criminal proceeding, the Circuit Court should  pre-trial or during trial
(1) Upon objection by a party, give that party a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witnesses, inspecting the physical evidence, etc.
(2) If, after this opportunity for familiarization, the objecting party believes that it may be prejudiced by lack of opportunity to prepare to meet the evidence, it must request a continuance. Failure to do so constitutes an acquiescence that the trial may commence or proceed and that the discovery rule violator may use the evidence as though there had been no discovery violation.
(3) If the objecting party requests a continuance, the discovery violator may choose to proceed with trial and forego using the undisclosed evidence.[[5]] If the discovery violator is not willing to proceed without the evidence, the Circuit Court must grant the continuance. See Cole v. State, 525 So.2d at 367-68, Darghty v. State, 530 So.2d [27] at 31-32 [(Miss. 1988)].
Houston, 531 So.2d at 611-12. (footnote omitted); see also Darby v. State, 538 So.2d 1168, 1176 (Miss. 1989); Nixon v. State, 533 So.2d 1078, 1090 (Miss. 1987); Davis v. State, 530 So.2d 694, 698 (Miss. 1988); Cole v. State, 525 So.2d 365, 367-68 (Miss. 1987); Shaw v. State, 521 So.2d 1278, 1281-82 (Miss. 1987); Griffin v. State, 504 So.2d 186, 195 (Miss. 1987); Watts v. State, 492 So.2d 1281, 1290 (Miss. 1986); Hall v. State, 490 So.2d 858, 859 (Miss. 1986); Gray v. State, 487 So.2d 1304, 1313-14 (Miss. 1986); Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986); Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986); Jones v. State, 481 So.2d 798, 803 (Miss. 1985); Cabello v. State, 471 So.2d 332, 343 (Miss. 1985). A motion for a mistrial suffices as a request for continuance in Box step (2).[6]
His objection made, West was of right entitled to a continuance, "a reasonable opportunity to make adequate accommodation." Robinson v. State, 508 So.2d 1067, 1071 (Miss. 1987); Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986). The question becomes whether the time granted defense counsel was "reasonable under the circumstances." In expounding Box' continuance mandate, Foster says

*19 By no means does this mean invariably that the defendant will be entitled to a continuance until the next term of court. There will no doubt be cases where postponement of a day or two, or in some cases even an hour or two, will suffice. Because the trial judge refused to grant Foster a reasonable continuance under the circumstances, this conviction must be reversed and the case remanded for a new trial.
Foster, 484 So.2d at 1011; see also Moore v. State, 536 So.2d 909, 911 (Miss. 1988); Reuben v. State, 517 So.2d 1383, 1386 (Miss. 1987); Inman v. State, 515 So.2d 1150, 1153 (Miss. 1987); Stewart v. State, 512 So.2d at 893.
Reuben v. State touches the point of the temporal quantum of delay to which a surprised defendant is entitled. The prosecution had disclosed the name of the only eye witness to the homicide on the Friday before a Monday trial setting. In reversing, Reuben reasons that the state's tardy disclosure
placed the defense attorney in the unenviable position of having to track down the State's star witness between Friday night and Monday morning, in addition to having to prepare for the rest of the murder trial to commence on that same Monday.
Reuben, 517 So.2d at 1386-87; but see Cousan v. State, 543 So.2d at 178-79.
Today's setting is quite unusual. The prosecution's factual theory was that West shot Brim, rendered her unconscious and dying, and then removed her clothes and sexually assaulted her. Many would find the scenario intuitively implausible. Dr. Galvez's testimony went to the heart of this problem, offering an expert's view that such aberrant behavior does occur and providing a psychological underpinning therefor. The point becomes crucial[7] in that without the sexual assault, West's offense is not capital murder and he is thus ineligible for the death penalty. Miss. Code Ann. §§ 97-3-19(2)(e) and XX-XX-XXX(5)(d) (Supp. 1989). Beyond this, necrophilia is hardly a garden variety psychosexual phenomenon.
Precisely because the prosecution's necrophilia theory was so central to the question whether West could be exposed to the death penalty, a day's break in the action was an inadequate antidote for the prosecution's discovery violation. This is the sort of prosecution theory which, had the defense known of it prior to trial, may well have altered the entire defense strategy. It is the sort of theory which would no doubt have sent the experts scurrying to the books for study and reflection. With all else that must of necessity be juggled in the course of a capital murder trial, unreality attends any suggestion that defense counsel can stop in midstream and become sufficiently informed on a subject like necrophilia to cross-examine with competence.
There is a second problem, in and of itself fatal. The prosecution first proffered Dr. Galvez' necrophilia testimony at a little past 10:00 a.m. on November 11, 1987. After the defense objected to the testimony, claiming surprise, counsel was given an opportunity to interview Galvez. At the conclusion of the ten minute interview, defense counsel stated that more time would be necessary in order to prepare for a meaningful cross-examination on this issue. The Circuit Court ruled that the direct testimony of Dr. Galvez concerning necrophilia would be immediately accepted into evidence, noting that the defense would be allowed to re-call Dr. Galvez and cross-examine *20 him on necrophilia at some later stage of the trial. Defense counsel stated that he was not prepared to go forward at that time and "if we go forward, it will be out of this court's ruling and no other reason." The defense requested a mistrial at that time.
In the end Dr. Galvez' direct testimony was completed before noon. Defense counsel was required thereafter to cross-examine Dr. Galvez on all points other than necrophilia and several other witnesses were then called by the prosecution, reserving the defense right to recall Dr. Galvez for cross-examination on the necrophilia point. This is not the sort of continuance Box contemplates.
Little familiarity with the trial process is required to know that cross-examination, like justice, when delayed may be effectively denied. Where under Box the circuit court orders a break in the action to allow counsel to become familiar with evidence that should have been produced in discovery but wasn't, that break should occur before the party proffering the undiscovered evidence is allowed to proceed. And that party should not be allowed to proceed until counsel opposite announces that he or she is ready.[8] In such circumstances one party or the other's case is bound to suffer from the necessary discontinuity. Fairness requires that this be the party who violated its discovery obligations in the first place.

C.

Predicate
There is a further problem with the admission of Dr. Galvez' exposition on necrophilia. It lacks the required evidentiary predicate connecting it to West's behavior at issue.
Dr. Galvez gave a free floating lecture on necrophilia from its "very mild" form to "the most severe." Neither he nor any other prosecution witness offered an opinion that Othie Lee West was "suffering from" necrophilia on June 5, 1983, nor did the prosecution in any other way tell the jury that the psychosexual disorder Dr. Galvez' labeled necrophilia explained West's behavior on that day, except to say that in the most severe form of necrophilia the disturbed person wants to maintain total control of his victim, that killing the victim is the ultimate form of control and that Brim had been "totally incapacitated" by her assailant (in response to a rather suggestive question from the prosecution, i.e., "whether after that gunshot wound was inflicted to Mary Ann Brim's body whether or not she was totally incapacitated," Dr. Galvez stated, "Yes, she was.")
In a variety of contexts our law has long required that before it becomes admissible the opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified. See, e.g., Williams v. State, 544 So.2d 782, 786 (Miss. 1987); Stratton v. Webb, 513 So.2d 587, 590 (Miss. 1987); Pittman v. Hodges, 462 So.2d 330, 333-34 (Miss. 1984); Magnolia Hospital v. Moore, 320 So.2d 793, 799 (Miss. 1975). Where the insanity defense is raised, psychiatrists and psychologists are held as well to the reasonable certainty standard before their opinions may be admitted. See, e.g., Collins v. State, 361 So.2d 333, 336 (Miss. 1978); Baker v. State, 327 So.2d 288, 294-95 (Miss. 1976). Conversely, our law has precluded expert opinions which are indefinite or are expressed in terms of mere possibilities. Scott County Co-op v. Brown, 187 So.2d 321, 325-26 (Miss. 1966); General Benevolent Assoc. v. Fowler, 210 Miss. 578, 589, 50 So.2d 137, 142 (1951).
The Mississippi Rules of Evidence effective January 1, 1986, have enlarged upon these views but retained their essentials. Where a party offers expert opinion testimony, the case as a whole  as distinguished from that of each individual expert witness who testifies  must satisfy the predicate and reasonable probability standards.
*21 Rule 702 provides, if an expert's opinion is otherwise admissible, the witness "may testify in the form of an opinion or otherwise." Explaining the phrase "or otherwise," the Official Comment says "Rule 702 permits an expert to testify by giving an opinion or any other form of testimony, such as an exposition." That Dr. Galvez' testimony was expository in nature affords no per se objection to admissibility. But nothing in Rule 702 relieved the prosecution of its obligation, if it wished to pursue a necrophilia theory, to provide a competent evidentiary predicate that West "suffered from" necrophilia reasonably explaining and, more important, producing the behavior for which he has been charged. The common form of such a predicate would be testimony from an expert that he had examined, tested, and obtained a history from or regarding West. A more cumbersome form, of course, is a hypothetical question incorporating the essential facts otherwise in evidence. See Rule 703, Miss.R.Ev.
The point is that, while Rule 702 may have relieved Dr. Galvez of the duty to supply this predicate, the prosecution was obligated somehow to supply it, probably through another expert. The Rules afford a measure of flexibility regarding the order of such proof. See Rules 104(b) and 611(a), Miss.R.Ev. Our law commanded in the end that the prosecution's aggregate expert presentation establish, both a Rule 703 predicate and a Rule 702 opinion stated with reasonable certainty, given the state of knowledge in the field, that West's necrophilia explained his behavior on the evening of June 5, 1983. By these standards the prosecution's necrophilia presentation was woefully inadequate.
The admissibility of testimony legally analogous to that before us today was considered by the Supreme Court of Kansas in State v. Clements, 770 P.2d 447 (Kan. 1989). There the prosecution had, over defense objection, introduced extensive expert testimony with respect to the psychology of the child sexual abuser. The psychiatric testimony related to the psychosexual disorder termed "pedophilia" and was presented in an objective and abstract manner. 770 P.2d at 451-52. On appeal the state contended that the testimony was properly admitted to assist the jury in understanding the nature of child sexual abuse generally (a matter allegedly outside the ken of the average juror) and that it was not presented in a manner which directly reflected upon the guilt of the accused. In reversing, the court held:
that (1) evidence which only describes the characteristics of the typical offender has no relevance to whether the defendant committed the crime in question; and (2) the only inference which can be drawn from such evidence, namely that a defendant who matches the profile must be guilty, is an impermissible one.
Clements, 770 P.2d at 454-55. A decision to the same effect relating to a prosecution expert's discussion of the motivations of the typical pedophile is Haakanson v. State, 760 P.2d 1030, 1035-38 (Alaska App. 1988).
Generally speaking, evidence is admissible if it goes to the proof or rebuttal of an element of the offense charged, including whether the accused may be guilty of some lesser included offense (only), or some legally recognized defense, justification or excuse. Expert opinion evidence requires scrutiny under the same relevancy rule. To be admissible, however, such testimony must be grounded upon predicates adequate under Rule 703. Expert opinion testimony not tied to the individual whose behavior is at issue and not stated with reasonable certainty flunks the test. The Circuit Court erred when it overruled West's objection to Dr. Galvez' necrophilia testimony. The error is of such proportions that we must reverse. Rule 103(a), Miss.R.Ev.

VI.
As the case must be retried, we note one further point. West complains of questions the prosecuting attorney propounded to the prospective jurors on voir dire examination. He cites Rule 5.02, Miss.Unif.Crim. R.Cir.Ct.Prac., which in relevant part provides: "No hypothetical questions requiring any juror to pledge a particular verdict *22 will be asked." Our review of the voir dire examination suggests that West's point is not without merit. In a variety of contexts, the prosecuting attorney would ask one or more prospective jurors to assume a given set of facts and then ask the jurors if they could vote for the death penalty, notwithstanding that set of facts.
We addressed the point in West I and directed that the prosecuting attorneys "avoid questions seeking a promise or commitment from the jury to convict if the State proved certain facts," citing Murphy v. State, 246 So.2d 920 (Miss. 1971). West I, 485 So.2d at 686.
Our law allows an attorney for either side to probe the prejudices of the prospective jurors to the end that all will understand the jurors' thoughts on matters directly related to the issues to be tried. What is impermissible is for an attorney to attempt to secure from the juror a pledge that, if a certain set of facts occur or are presented, the juror will vote a certain way. We take this view because there may well be other facts which would require a conscientious juror to do otherwise even though the assumed hypothetical fact comes to pass. Furthermore, in the course of deliberation a juror should be encumbered by her oath, the evidence and the instructions from the trial court  and nothing more.
Because we are reversing on other grounds, it is not necessary to detail the particular offenses on this point. Suffice it to say that in our case law makes clear that we intend the injunction of Rule 5.02 to be obeyed. Harris v. State, 532 So.2d 602, 605, 607 (Miss. 1988); Stringer v. State, 500 So.2d 928, 938 (Miss. 1986); Pinkney v. State, 538 So.2d 329, 348-49 (Miss. 1988); Williams v. State, 544 So.2d 782, 784-85 (Miss. 1987). A word to the wise should be sufficient.

VII.
For the reasons articulated above, we hold the presentation to the jury of Dr. Galvez' necrophilia opinion testimony, notwithstanding West's rights under our law of discovery and relevant evidence, denied West his substantial right to a fair trial. Rule 103(a), Miss.R.Ev.; see Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988). The conviction of West of the crime of capital murder and the sentence imposed thereupon are vacated and reversed and this case is remanded to the Circuit Court of Hinds County for a new trial consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] This is West's second appearance here. The facts have been described in detail in West v. State, 485 So.2d 681, 682-84 (Miss. 1985) (West I). We provide today an abbreviated version.
[2] On September 22, 1978  some six weeks prior to trial  the Circuit Court had entered an order appointing Dr. Donald C. Guild, psychiatrist, and Dr. Charlton S. Stanley, psychologist, as independent experts to assist the defense, at the expense of the State.

Inexplicably, there is a further order entered the second day of trial, November 10, 1987,
That the defendant may employ an independent private psychiatrist or psychologist, forensic seriologist, and a pathologist on behalf of defendant at the expense of the State.
With reference to the psychiatrist and psychologist, the order would appear to be duplicative.
Defense counsel had sought such assistance in substantial part to develop proof of possible mitigating circumstances, in anticipation of a penalty phase trial, Miss. Code Ann. § 99-19-101(6)(b) or (f) (Supp. 1989), but hardly in anticipation of Dr. Galvez' necrophilia theory.
[3] At oral argument before this Court, West's counsel stated once again that before trial the prosecution had assured him that Dr. Galvez' testimony would be limited to the matters discussed at West's first trial, to which counsel for the prosecution took no exception. In urging affirmance on this point, the prosecution in no way argues that West had not made an adequate request for discovery, nor that West had obtained no order for discovery of this sort of expert evidence, nor that West is saddled with any other procedural default.
[4] There is an analogous point, deriving from Rule 4.08(2) of the Uniform Criminal Rules of Circuit Court Practice. Although designated "Rule 4.08 Insanity Defense," the rule addresses three distinct areas of criminal practice  inability to assist defense counsel because of insanity (4.08(1)), the traditional insanity defense (4.08(2) ¶ 1 et seq.), and diminished capacity (4.08(2) ¶ 4 et seq.). As to the prosecution's duty to disclose in this third area, the rule states:

The prosecuting attorney shall serve notice promptly, but in no event less than 10 days prior to trial, upon the defendant stating the names and addresses of any witness upon whom the state intends to rely relating to the issue of the defendant's mental condition at the time of the alleged offense or the defendant's mental state required for the offense charged.
Unif.Crim.R.Cir.Ct. Prac. 4.08(2) ¶ 6.
The testimony of Dr. Galvez regarding necrophilia was directed toward "the issue of the defendant's mental condition at the time of the alleged offense". Indeed, the prosecutor's proffered reason for eliciting the testimony was to prove West's depraved motivation for shooting Brim prior to sexually assaulting her  "There's no way that anybody other than somebody who knew she was gonna be physically incapacitated would have had sex with her. It goes specifically to motivate ..."
Whether under Rule 4.06 or Rule 4.08, therefore, it was incumbent upon the prosecution to disclose its intent to introduce expert psychiatric testimony during the guilt phase of the capital trial. Ultimately, the fact that Dr. Galvez was to speak on this topic was discoverable and should have been disclosed to the defense reasonably in advance of trial.
[5] This point should be noted further. Once defense counsel stated his objection, the prosecution wholly possessed the power to avoid the error which now mandates reversal. Had discretion appeared the better part of valor, the prosecution may have withdrawn its proffer of Dr. Galvez' necrophilia testimony.
[6] Whatever doubt there may once have been, see Griffin v. State, 504 So.2d 186, 195 (Miss. 1987), we now accept that a motion for a mistrial in this context is the functional equivalent of a motion for a continuance and, more important, a post-objection motion "for a mistrial" rather than "for a continuance" is adequate to preserve the point for appeal. See Darby v. State, 538 So.2d 1168, 1177 (Miss. 1989) (Hawkins, P.J., joined by Dan M. Lee, P.J., and Sullivan, J., concurring in part, dissenting in part); Ryan v. State, 525 So.2d 799, 802 (Miss. 1988) (defense "motion for continuance or mistrial" required); Cole v. State, 525 So.2d 365, 382-83 (Robertson, J., concurring, joined by Dan M. Lee, P.J., Prather and Anderson, JJ.) ("motion for continuance  a motion for mistrial would be the equivalent"); Shaw v. State, 521 So.2d 1278, 1283 (Miss. 1988) (Hawkins, P.J.; joined by Sullivan and Zuccaro, JJ., concurring); Robinson v. State, 508 So.2d 1067, 1071 (Miss. 1987) (in Box step two, defense counsel "should request either a continuance or a mistrial"); Gray v. State, 487 So.2d 1304, 1313 (Miss. 1986) (point preserved by defendant's "motion for a mistrial").
[7] Although the psychiatric testimony was presented in a dry, academic fashion, during closing argument the prosecutor demonstrated to the jury the inference it wished them to draw:

You heard what Dr. Galvez said. In every sexual assault, the fundamental desire is control.
* * * * * *
This defendant's controlled everything to this point. He's made all the decisions. He's decided everything.
* * * * * *
You bet she screams. And as Dr. Galvez told you, the fun is the control.
BY MR. COXWELL: I object to that line of argument....
BY THE COURT: Overruled.
BY MS. HEWES: In any sexual assault, the thrill is the control. And as Mary Ann Brim lay on that floor looking at the barrel of that gun, he had an opportunity to really enjoy himself... . This is really fun.
[8] Presiding Justice Hawkins in his dissent in Cole v. State, 525 So.2d 365, 380-81 (Miss. 1987), and Justice Sullivan in his dissent in Nixon v. State, 533 So.2d 1078, 1106-07 (Miss. 1987) well articulate why the circuit court's remedial action must in fairness occur before the prosecution is allowed to present the disputed evidence to the jury.