# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00566-SCT

*ALVIN JUDE RUSSELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/1999 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL W. CROSBY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/19/2001 |
| MOTION FOR REHEARING FILED: | 5/18/2001; denied 7/19/2001 |
| MANDATE ISSUED: | 7/26/2001 |

## BEFORE BANKS, P.J., SMITH AND MILLS, JJ.

### MILLS, JUSTICE, FOR THE COURT:

¶1. Alvin Jude Russell was convicted of murder in the Circuit Court of the First Judicial District of Harrison County and was sentenced to life imprisonment. The Court of Appeals reversed and remanded the case for a new trial for failure of the trial court to grant jury instructions on the defendant's theory of defense. This Court granted the State's petition for writ of certiorari and affirmed the decision of the Court of Appeals. *Russell v. State*, 729 So. 2d 781 (Miss. 1997). We held that Russell should have been allowed to assert the defenses of insanity and manslaughter. On remand Russell was again found guilty of murder. He timely perfected this appeal.

## FACTS

¶2. On September 17, 1992, Russell was charged with murder for the shooting death of his wife Rebecca. At the time of the shooting, Russell was forty-eight years old and had many physical and emotional problems. He had been diagnosed as having a tumor on his pituitary gland. This condition caused him sometimes to be confused and disoriented. He was also suffering from depression due to forced early retirement from his twenty-four-year employment with IBM. The company was downsizing, and Russell feared a lay-off with no income and, thus, chose retirement. A subsequent business venture with his wife failed. As a result of the strain caused by these problems, Russell's wife left him and filed for divorce.

¶3. On the day of the incident, Russell and his wife met at a bank to withdraw money from a joint bank account. When Rebecca arrived, Russell went to her car and began talking to her about splitting their property equally. Rebecca said that she would discuss the issue with her lawyer and turned to walk toward the bank. Russell testified that he did not know or remember what happened next, but he heard a gunshot

and realized he had a gun in his hand. Russell then shot his wife again as she lay on the ground. He testified that he did not understand why he shot her again.

¶4. Witnesses described a discussion which grew into an argument followed by pushing or hitting and then the shooting. One of these witnesses, Brenda Johnson, also described an encounter she had with Russell in the bank parking lot ten to fifteen minutes before Rebecca arrived. She testified that Russell seemed oriented, sober, and lucid at that time.

¶5. After shooting his wife, Russell waited for the police to arrive. He told the officer that he had just killed his wife. The officer testified that Russell was calm and cooperative and understood and followed the officer's instructions.

## ANALYSIS

### I. WHETHER THE TRIAL COURT ERRED BY GRANTING INSTRUCTIONS WHICH INCORRECTLY DEFINED MALICE AFORETHOUGHT THEREBY NEGATING THE MANSLAUGHTER DEFENSE.

¶6. The trial court granted two of the State's instructions regarding malice aforethought and manslaughter and refused Russell's instruction defining malice aforethought. Russell contends that the court's actions resulted in confusing and misleading instructions and, in effect, denied him the defense of manslaughter. Specifically, he contends that the jury could not have understood that one could have an intent to kill and nonetheless be guilty of no more than manslaughter.

¶7. State's instruction S-5A, which was granted, states as follows:

The Court instructs the Jury that malice aforethought is required by Mississippi law to make a homicide a murder. Malice aforethought means intent to kill, without authority of law and not being under circumstances that would reduce the act to a lesser crime.

¶8. State's instruction S-7 was also granted and states as follows:

The Court instructs the Jury that the term "heat of passion" is defined as a state of violent, uncontrollable rage engendered by certain provocation given, and will reduce a homicide from the grade of Murder to that of Manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. [sic] The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

¶9. Russell argues that his instruction D-7 (Alt. 1), which was refused, would have helped explain the difference between murder and manslaughter and that both contain the element of intent. That instruction states as follows:

The court instructs the jury that "malice aforethought," as defined, indicates a full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences; to calculate, plan, contemplate.

¶10. Russell's instruction D-4 (Alt. 1) was granted. This instruction first lists the material elements required for a finding of guilt of murder and then details the elements of manslaughter. The portion of the instruction

pertaining to manslaughter states as follows:

> However, if the State has failed to prove any one or more of these elements of the charge of murder beyond a reasonable doubt, you will proceed with your deliberation to decide whether the State has proved beyond a reasonable doubt the crime of Manslaughter. The court instructs the jury that Manslaughter is the killing of a human being, without malice aforethought, and in the heat of passion by the use of a deadly weapon, without authority of law.

> Thus, if you find from the evidence, that the State has proven beyond a reasonable doubt all of the following material elements that:

> 1. On September 17, 1992, in the First Judicial District of Harrison County, Mississippi,

> 2. The Defendant, ALVIN JUDE RUSSELL, did wilfully, feloniously and without authority of law and without malice aforethought, in the heat of passion, with the use of a deadly weapon, did shoot and kill Rebecca June Russell, a living person, and further,

> 3. That the Defendant had the mental capacity to realize and appreciate the nature and quality of his acts and to distinguish between right and wrong at the time he committed these acts

> then you shall find the Defendant, ALVIN JUDE RUSSELL, Guilty of Manslaughter.

> If after considering all of the evidence in this case you find the State has failed to prove beyond a reasonable doubt that the Defendant was sane at the time of the commission of either Murder or Manslaughter, then your verdict must be Not Guilty by reason of insanity.

¶11. Russell cites *Williams v. State*, 729 So. 2d 1181 (Miss. 1998), in support of his proposition that it was error to exclude his definition of malice aforethought. This Court stated the following in *Williams*:

> What is under consideration in this case is whether, in a prosecution for deliberate design murder, where a manslaughter instruction is warranted and granted, the jury should be instructed as to how to determine the "aforethought" portion of "malice aforethought" or the "deliberation" portion of "deliberate design." We hold that such an instruction is proper in such a case as this, and error in this case to refuse a proper instruction (D-10) thereon.

*Id.* at 1184.

¶12. We find that the jury in the present case was not properly instructed regarding malice aforethought. The language of instruction S-5A is unclear and does not sufficiently define the term, and no other granted instructions provide an adequate definition. We have held numerous times that "[t]his Court will not reverse for denial of an individual instruction when the jury has been instructed properly and fully by the granting of all the instructions." *Id.* (quoting *Collins v. State*, 594 So. 2d 29, 35 (Miss. 1992)). A holistic reading of the instructions in this case does not correct the error. The definition of malice aforethought is simply absent. Therefore, Russell's instruction D-7 (Alt. 1) should have been granted. The judge committed reversible error by failing to grant the instruction.

### II. WHETHER THE TRIAL COURT ERRED IN ALLOWING A NON-TESTIFYING EXPERT'S WRITTEN OPINION TO IMPEACH RUSSELL'S EXPERT.

¶13. Russell relied on the expert testimony of Dr. James Rusch, a certified psychiatrist, to establish the defense of temporary insanity. Dr. Rusch testified that "at the time of the shooting [Russell] could not realize and appreciate the nature and the quality of his actions and be able to distinguish the wrongfulness or the right from wrong at that time." Dr. Rusch was not involved in Russell's first trial. In the prior trial, the defense had retained Dr. Aris Cox, who rendered his opinion in a letter dated September 7, 1993. That letter states in pertinent part, "It is not my opinion, however, that Mr. Russell suffers from a mental disease or defect of sufficient intensity to rise to the level of the M'Naghten standard. Specifically, it is my opinion he was able to distinguish right from wrong at the time."

¶14. Dr. Cox testified in proffer in the first trial. *Russell*, 729 So. 2d at 783. The trial judge excluded the testimony because the doctor could not conclude that Russell did not know the difference between right and wrong and, thus, could not lay the proper predicate for an insanity defense. *Id.* Neither side retained Dr. Cox's services in the second trial. The State was allowed, however, to impeach Dr. Rusch by having him read from Dr. Cox's letter. Russell contends that the trial court erred by allowing the State to impeach in this manner and that the error violated his constitutional rights-specifically his right to a fair trial and his right to confront a witness against him.

¶15. Dr. Rusch testified that he had read Dr. Cox's testimony, which he described as consistent with the letter in question "in an effort to form the basis of [his] opinion or assist [him] in basing an opinion." M.R.E. 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*See, e.g.*, *Jones v. State*, 776 So.2d 643 (Miss. 2000) (holding that testimony of pathologist that a forensic anthropologist confirmed his findings was admissible under M.R.E. 703). Testimony regarding Dr. Cox's opinion was admissible for impeachment purposes since Dr. Rusch testified that he had used these matters in formulating his own opinion. Had that predicate not been properly laid, the testimony about Dr. Cox's opinion might not have been admissible since it appears from the record that the opinion was obtained strictly for the purposes of litigation and not in the course of patient treatment. In this particular instance, however, we find no error regarding the admission of this testimony.

¶16. Russell also contends that error was committed in closing argument when the State attempted to read from Dr. Cox's letter, which was never admitted into evidence. The trial court sustained Russell's objection but allowed the State to recall without reference to the material Dr. Rusch's testimony regarding Dr. Cox's letter. The prosecutor then stated to the jury, "And I asked [Dr. Rusch] about having contacted Dr. Cox, and he said, 'No. I didn't do that.' I said, 'Well, did you read his report where it says he does not have a mental disease that rises to the level of M'Naghten insanity?'" Later, during deliberations, the jury sent a note to the court stating, "We would like a copy of the M'Naghten rule." The trial court gave the jury instruction C-30 which stated as follows:

> The court instructs the jury that the M'Naghten rule is the legal test for insanity in the State of Mississippi. It is defined in Jury Instruction D-4(Alt.1) in element number three and asks the question:

> Did the Defendant have the mental capacity to realize and appreciate the nature and quality of his acts

and to distinguish between right and wrong at the time he committed these acts?

¶17. Russell argues that the prosecutor's comments that Dr. Cox did not find Russell M'Naghten insane, when combined with the court's subsequent instruction regarding the M'Naghten rule, resulted in reversible error. Specifically, Russell contends that the jury would have had to assume that Dr. Cox applied the same M'Naghten definition as the trial court presented the jury, when, in fact, Dr. Cox's letter omitted the phrase "and appreciate the quality and nature of his acts."

¶18. In *Mickell v. State*, 735 So. 2d 1031 (Miss. 1999), we found that the trial judge committed reversible error in his answer to a jury inquiry. *Id.* at 1034. During deliberations the jury sent a note to the judge which asked, "Can we convict a person of armed robbery without the policeman finding the gun or a gun?" *Id.* at 1033. The trial judge wrote "yes" on the note and returned it to the jury. *Id.* Mickell argued that the judge's response to the jury's inquiry violated Miss. Code Ann. § 99-17-35 (1994), which provides in relevant part that "[t]he judge in any criminal cause shall not sum up or comment on the testimony or charge the jury as to the weight of evidence. . . ." *Id.* We agreed that the judge's comment was prejudicial to Mickell and held:

> The trial court's answer to the jury's question in the case sub judice impermissibly singled out the lack of specific evidence for particular attention by the jury and served to minimize the significance of the fact that no gun had been found by the police-an issue which was central to the case. The fact that the jury asked the question at all indicates that there may well have been jurors who had concluded that the State's failure to recover a weapon was sufficient to raise a reasonable doubt that the crime of armed robbery had been committed. A pronouncement by the trial court that such evidence was not essential to a conviction for armed robbery could easily have undermined a legitimate analysis of the strength of the State's proof. It is for this specific reason that judges are constrained from discussing the significance of any particular portion of the evidence.

*Id.* at 1034. We find that such error did not occur in the present case. The trial court's providing the jury with a definition of the M'Naghten rule did not "impermissibly single out for particular attention" any specific evidence or lack thereof. Nor could the answer to the jury's inquiry "have undermined a legitimate analysis of the strength of the State's proof."

¶19. Any connection between the prosecutor's comments regarding Dr. Cox and Dr. Rusch and the jury's request for a definition of M'Naghten is purely speculative. Russell's sanity was a central issue in this case. It seems both logical and natural that the jury would request and be entitled to a precise definition of the very rule which this state employs to determine a person's sanity. Here the trial judge did not commit reversible error.

### III. WHETHER THE TRIAL COURT ERRED IN ITS HANDLING OF AN ALLEGED DISCOVERY VIOLATION.

¶20. Russell contends that the trial judge committed reversible error in its handling of an alleged discovery violation under U.R.C.C.C. 9.04. State's witness Brenda Johnson gave a statement to the police on the day of the shooting, September 17, 1992. In her statement she described what she had seen pertaining to the incident but did not include the information that she had first observed Russell in the bank parking lot ten to fifteen minutes before his wife arrived. At trial, she testified over Russell's objection that Russell was smiling, that he said "hi" to her and her son, and that Russell did not seem confused or disoriented in any way. The

State asserted that it was unaware of this new testimony until minutes before Johnson took the stand.

¶21. Russell made a *Box* motion and requested the opportunity to interview the witness outside the presence of the jury. *See Box v. State*, 437 So. 2d 19 (Miss. 1983). The court overruled the motion and found no discovery violation. Russell attempted to impeach Johnson concerning the absence of the information in her statement to the police, but the court did not allow this line of questioning.

¶22. The State concedes that Johnson's oral statements containing new information regarding her encounter with Russell should have been disclosed pursuant to U.R.C.C.C. 9.04 and were not. The State argues, however, that its failure to disclose this information is not a fatal flaw under the facts of this case. The State contends that Johnson's surprise testimony could not have affected the outcome of this case given the "overwhelming [and] virtually uncontradicted" evidence against Russell. The State cites *Dennis v. State*, 555 So. 2d 679, 682 (Miss. 1989) in support of its position. There we stated:

> A violation of Rule 4.06 of the Uniform Criminal Rules of Circuit Court [now U.R.C.C.C. 9.04] is harmless error "unless it shall affirmatively appear, from the whole record, that such . . . has resulted in a miscarriage of justice." *McKinney v. State*, 482 So. 2d 1129 (Miss. 1986) (quoting *Buckhalter v. State*, 480 So. 2d 1128 (Miss. 1985)). In the case before us, and under its facts, the error has, indeed, proved harmless.

*Dennis*, 555 So.2d at 682.

¶23. *Dennis* is distinguishable from the case at bar. The discovery violation at issue there involved a revised witness list which was not served on the defendant. *Id.* at 682. Two additional names were included on this revised list. *Id.* The facts of the case sub judice show that Russell was aware that Johnson might testify but was unaware of Johnson's added testimony until that testimony was offered on the stand. In *Dennis*, no surprise was alleged.

¶24. Further, the State's argument does not withstand this Court's ruling in *Ramos v. State*, 710 So. 2d 380 (Miss. 1998). In *Ramos* we reversed on certiorari review the Court of Appeals' decision affirming a felony drug possession conviction. *Id.* We found reversible error in the trial court's failure to grant a mistrial or continuance in light of the State's discovery violation in introducing multiple inculpatory statements and documents which had not been provided to the defense. *Id.* at 386. The Court of Appeals had found that a continuance should have been granted but that the error did not warrant reversal. *Id.* at 385. We disagreed stating:

> The finding of harmless error appears to contradict published decisions of this Court. In *West v. State*, 553 So. 2d 8, 17 (Miss. 1989), we found that the fact that the prosecution fails to unearth evidence until the last minute does not "eviscerate the prejudice to a defendant caught unaware, nor the necessity for reversal" where the trial court denies the defense request for a reasonable continuance, citing Rule 4.06(e).

*Ramos*, 710 So.2d at 385. Thus, in light of *Ramos* and *West*, the fact that the prosecution failed to "unearth evidence [of Johnson's additional testimony] until the last minute" does not justify the discovery violation, nor does it prevent reversal.

¶25. *Box* and its progeny provided guidelines for trial judges in dealing with discovery violations. We examined those cases in *Ramos* and set forth the following procedure for the trial court to follow:

1) Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.

2) If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes waiver of the issue.

3) If the defendant does request a continuance, the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.

*Ramos*, 710 So. 2d at 385.

¶26. The trial judge in the case sub judice failed to follow this procedure from the beginning by refusing to allow Russell to interview the witness. Russell, like Ramos, put forth every effort to convince the trial judge to follow the *Box* procedure, but the judge refused. We find that the judge committed reversible error in failing to follow the proper procedure.

¶27. It should be noted, though the State fails to argue this point, that the trial judge did not find a discovery violation and used that fact to justify his denial of a continuance. The judge stated:

Now in *Box*, as I understood, the Court found a violation, that there was a violation of discovery, and the most practical, common sense resolution of it was to permit the defendant or the State to interview the witness and then come back and advise the Court how they are adversely impacted if we continue with the trial because of the discovery violation. And then if they make a sufficient finding then I have the alternatives of aborting the trial or going for a continuance or whatever the circumstances may mandate. But I've made the determination that there is no discovery violation.

¶28. This analysis of *Box* is flawed. We have articulated no requirement in *Box* or *Ramos* that the trial court find a discovery violation before allowing the defendant to interview the witness and proceed through the steps outlined above. Further, the State has conceded the existence of a discovery violation by stating in its brief, "the procedures of U.R.C.C.C. 9.04 should have been followed, and they were not."

¶29. In ruling on Russell's *Box* motion the trial judge stated:

So in every trial, and I want the Supreme Court to address this, in every trial in which the witness says something beyond a statement narrative from the law enforcement agency and that statement or that response was not even elicited from anyone in that narrative then we're going to stop the trial and consume 10, 15, or 30 minutes for the attorney to investigate the case is what you're asking me to do as far as *Box*.

¶30. We urge the trial court to follow the dictates of common sense on a case-by-case basis when faced with such a situation. Where, as here, the defendant is surprised with new evidence and where, as here, that evidence was known to the prosecution, though only for a short time, and where, as here, that evidence is detrimental to a central theory of defense, the defendant is entitled, at the very least, to an interview with the witness. The consumption of "10, 15, or 30 minutes for the attorney to investigate the case" is a small price

to pay to insure that the rule of law is followed.

¶31. Russell also contends that his cross-examination of Johnson was improperly restricted. Specifically, he asserts that he should have been allowed to impeach the witness by questioning her failure to tell the police about her encounter with Russell. He attempted this line of questioning, and the trial judge did not allow it. We find that the trial court's failure to allow Russell's attempts at impeachment further compounded the error the court had already committed in refusing to follow the *Box* procedure.

## CONCLUSION

¶32. Russell was refused an adequate instruction regarding malice aforethought. Additionally, the trial court failed to follow the proper procedures regarding Brenda Johnson's testimony. We find that the trial court's errors warrant reversal. For the foregoing reasons, we reverse the judgment of the Circuit Court of the First Judicial District of Harrison County and remand for a new trial.

¶33. **REVERSED AND REMANDED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, WALLER AND DIAZ, JJ., CONCUR. COBB, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**