# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-KA-01471-SCT

*DAVID W. PARVIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2011 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES LAWTON ROBERTSON |
| | JIM WAIDE |
| | RACHEL MARIE PIERCE |
| | WILLIAM TUCKER CARRINGTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | JOHN R. HENRY, JR. |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/11/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND PIERCE, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     David W. Parvin appeals his murder conviction, characterizing his arguments as "a

*Weathersby* case with a *Daubert* twist."[1]  Parvin maintains that his wife's death was caused

---

[1]*See **Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L.
Ed. 2d 469 (1993) (discussing the standards governing the admissibility of expert testimony);
***Weathersby v. State***, 265 Miss. 207, 209, 147 So. 481, 482 (1933) (reiterating the rule that
"where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide,
their version, if reasonable, must be accepted as true, unless substantially contradicted in
material particulars by a credible witness or witnesses for the state, or by the physical facts

by accident, and the State's principal evidence refuting his defense at trial consisted of expert testimony, accompanied by a computer-generated reconstruction of the scene of her demise. The State argued that the experts' opinions about the physical evidence proved the victim was intentionally killed. Although we find no merit in Parvin's *Weathersby* claim, we agree that certain expert testimony and the visual depiction of that testimony should not have been presented to the jury. Because this evidence severely prejudiced Parvin's defense, we reverse the conviction and remand the case to the Monroe County Circuit Court for a new trial.

### *The Evidence*

¶2. On the morning of October 15, 2007, Dr. David Parvin[2] called 911 to report that he accidentally had shot Joyce Parvin, his wife of forty-nine years, at their home near Aberdeen, Mississippi. When law enforcement officials arrived, Joyce was dead. She was found in a desk chair, her body draped over the left armrest, with a shotgun wound on the right side of her torso.

¶3. Parvin reported to the investigating officers that he had been rushing out of the house to shoot a beaver and was carrying a loaded shotgun.[3] According to Parvin, in his haste, he

---

or by the facts of common knowledge") (citations omitted)).

[2]Parvin holds a Ph.D. degree in economics from the University of Florida and taught at Mississippi State University before he retired. He was 68 years old on the day his wife was shot.

[3] The Parvins' home was located on the Tennessee-Tombigbee Waterway. According to trial testimony, beavers and "beaver-like" creatures inhabit the region and are deemed noxious by the local waterfront community. With no animal-control services, the local

tripped, and during his fall, the gun discharged, shooting his wife, who was seated at their home computer. He told the officers that he believed the gun had been parallel to the floor or slightly elevated. He also was unsure about some of the other details: whether he or his wife had spotted the beavers first; whether he had tripped over the rug or the dog; whether his knee had hit the floor; and whether the barrel of the gun had hit the armrest of the chair where Joyce was sitting at the moment it discharged. Parvin also said that he typically held the gun, a double-barreled Savage Arms Fox 12-gauge shotgun, with his left hand on the fore grip and his right hand around the trigger guard, but was unsure whether he had pulled one of the two triggers accidentally. Although Parvin was unsure about many of the details surrounding the incident, he maintained at trial that the shooting was an accident caused by his unexpectedly tripping and falling while holding the shotgun.

¶4.     Two law enforcement officials who had been dispatched to the Parvin house that day testified as witnesses for the State. Curtis Knight of the Monroe County Sheriff's Office said that he believed Joyce possibly had suffered a contact wound based on what appeared to be gunpowder on Joyce's shirt, and that no pellets from the shotgun had struck anything near her body. He also testified that the rug did not appear to be disturbed.

¶5.     Arthur Chancellor, a crime-scene analyst for the Mississippi Bureau of Investigation, confirmed Knight's impression that the rug was undisturbed. He also testified that no marks were on the walls or the floor which would have suggested to him that someone had tripped

residents customarily dealt with the unwanted animals by shooting them.

3

while holding a gun. He further opined that the "injury appeared to be going in a downward angle."

¶6. The State also presented the testimony of three witnesses, who were accepted by the trial court as experts in their respective fields: Starks Hathcock, a firearms expert who had tested the gun; Dr. Steven Hayne, a forensic pathologist who had performed the autopsy; and Grant Graham, a crime-scene analyst who presented to the jury a computer-generated depiction of the shooting. Hathcock testified that he had test fired the gun but was unable to establish a conclusive distance from muzzle to wound. In contrast to Hathcock's testimony, Dr. Hayne – who had neither tested nor seen the shotgun – testified that the muzzle had been approximately four feet away and estimated that the shotgun pellets had entered Joyce's torso "downward at 25 to 30 degrees [and] forward at approximately 15 degrees." Finally, Graham presented to the jury a computer-generated depiction of the shooting, relying on various measurements, which included Hayne's estimates.[4]

¶7. The State also presented two lay witnesses who had spoken with Parvin about the shooting. Betty Hamblin testified that Parvin initially had told her Joyce had committed suicide, but then he "changed his story" to the version he had given in his initial interview with police. According to Hamblin, she and Parvin had been engaged in an extramarital affair prior to and after the death of his wife, and she said that, after his wife's death, Parvin

_____

[4] We note that there was some debate during the proceedings below about whether Graham's visual re-creation of the shooting was a *simulation* or an *animation*. Throughout this opinion, we refer to the material as a *depiction* or *re-creation*.

4

had asked her to marry him. She said that she later learned that Parvin had been seeing still another woman, whom he eventually married instead.

¶8. Parvin's daughter, Amy Henley, also was a witness for the State and testified that, when she was growing up, her father had emphasized the importance of gun safety to her and her siblings, particularly with regard to ensuring that the gun remained unloaded.[5] She said that she was shocked when she heard what had happened and that it was "hard for me to imagine my father, that's been around guns all my life, would do something like that." Additionally, Henley testified that, on the day of her mother's shooting, her father's first words to her were "[d]on't worry about it. You'll get over it."

¶9. After a five-day trial, a Monroe County jury convicted Parvin of murder, and he was sentenced to life imprisonment. Aggrieved, Parvin appeals the judgment of conviction.

### *The Issues*

¶10. Parvin asserts that, because the only evidence that substantially contradicted his version of events was unreliable and inadmissible, this Court should reverse his conviction and render a judgment of acquittal. While we agree with Parvin that the State's case rested in large part on inadmissible evidence, we do not find that he is entitled to a judgment of acquittal based on the *Weathersby* rule. Because we reverse his conviction due to the

---

[5]According to Parvin, the loaded gun was kept, against his wishes, in the living quarters upstairs because of the frequency with which they were shooting animals. It previously had been kept in a locked room off the carport.

admission of highly speculative and prejudicial evidence, we do not address his assignments of error related to certain jury instructions.

## I.

¶11. Parvin argues that the computer-generated depiction of the shooting should have been excluded as scientifically unreliable, because it was based largely on Dr. Hayne's estimated measurements regarding distances at the scene and pellet trajectories and because it was created despite unknown variables (*e.g.*, Joyce's position).[6] Parvin also argues that Hayne's measurements were scientifically unreliable because they were not based on sufficient data, and because they were outside the scope of a forensic pathologist's expertise and function. To emphasize his point, Parvin correctly notes that the testimony of the State's firearms expert substantially contradicted that of Dr. Hayne.

### *Standard of Review and Pertinent Legal Standards*

¶12. On appeal, we review errors in the admission of evidence, including expert testimony and demonstrative evidence, for an abuse of discretion. *See, e.g., Bishop v. State*, 982 So. 2d 371, 380 (Miss. 2008) (standard of review for expert testimony); *Lewis v. State*, 725 So. 2d 183, 189 (Miss. 1998) (standard of review for demonstrative evidence). Under this standard, we will reverse a trial court's ruling if we find it to be "arbitrary and clearly erroneous." *Bishop*, 982 So. 2d at 380.

---

[6]Dr. Hayne never visited the shooting scene, and the record does not reflect that he ever saw the shotgun, except for his seeing it in the courtroom during the trial.

¶13. The legal standard governing expert testimony is found in Mississippi Rule of Evidence 702. The Rule provides that a properly qualified witness may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In interpreting Rule 702, this Court has looked to the standards applied by the federal courts, most notably *Daubert* and *Kumho Tire*. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003) (discussing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). A so-called *Daubert* analysis is flexible, and the factors considered by the trial court will depend on the particular circumstances of the case. *McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 594; *Kumho Tire*, 526 U.S. at 150-51). Nevertheless, whatever the factors considered by the trial court, "self-proclaimed accuracy by an expert [is] an insufficient measure of reliability." *Id.* (citing *Kumho Tire*, 526 U.S. at 157)).

¶14. Additionally, "the opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified." *West v. State*, 553 So. 2d 8, 20 (Miss. 1989) (citations omitted). In other words, these opinions "must rise above mere speculation." *Williams v. State*, 35 So. 3d 480, 486 (Miss. 2010) (quoting *Goforth v. City of Ridgeland*, 603 So. 2d 323, 329 (Miss. 1992)). "[I]ndefinite" expert opinions, or those "expressed in terms of mere possibilities," are not admissible.

7

*West*, 553 So. 2d at 20 (citing *Scott County Co-op v. Brown*, 187 So. 2d 321, 325-26 (Miss. 1966); *Gen. Benevolent Assoc. v. Fowler*, 210 Miss. 578, 589, 50 So. 2d 137, 142 (1951)). For example, we have held that an expert's offering a "reasonable hypothesis" was insufficient, explaining that "[e]xpert testimony should be made of sterner stuff." *Goforth*, 603 So. 2d at 329.

### *Procedural Bar*

¶15.    As an initial matter, the State argues that the issue of the reliability of Dr. Hayne's estimated measurements is procedurally barred because Parvin failed to make a contemporaneous objection at trial.  However, when a party files a motion *in limine* to exclude the evidence, or has otherwise objected to its admission, and the objection is overruled, the party may try the case on the assumption that the court's prior ruling will stand.  *Goff v. State*, 14 So. 3d 625, 640 (Miss. 2009) (citing *Kettle v. State*, 641 So. 2d 746, 748 (Miss. 1994)); *Jones v. State*, 461 So. 2d 686, 702 (Miss. 1984).

¶16.    Well before trial, counsel for Parvin filed a motion *in limine* to exclude various aspects of anticipated evidence, including Graham's reconstruction and any testimony from Dr. Hayne.  We recognize that this motion was very general in nature, and Parvin's attorney did not request a pretrial *Daubert* hearing with regard to Hayne.  However, after the trial court had held a hearing and overruled the motion with respect to Graham, Parvin filed a very detailed *pro se* motion attacking the credibility of the distance and trajectory estimates in Hayne's autopsy report.  In that motion, Parvin maintained that the muzzle-to-target distance and the shot trajectories provided in Hayne's autopsy report were made "without comment,

8

explanation, or support," and none of these measurements could be "determined by the autopsy report or any of the related scientific tests." Parvin attached to his motion the autopsy report, Hathcock's reports, prints of Graham's computer-generated presentation, and Graham's written report describing what Graham termed his "best explanation of events." Moreover, Parvin's motion cited specific portions of these exhibits to support his argument that the autopsy's estimates were unreliable.

¶17. Not long afterward, Parvin wrote a letter to the trial judge, filed in the circuit clerk's papers, requesting a hearing regarding Dr. Hayne's opinions. According to his letter, Parvin was having difficulty contacting his attorneys and feared that his motion would not be heard before trial. Parvin wrote, "[t]o let Hayne testify at trial without the defense having the opportunity to question him without the jury would be unfair to the defense."

¶18. Parvin's motion and request for a hearing remained unanswered until the morning of trial. Before the jury selection, the trial judge addressed outstanding motions, including Parvin's *pro se* motion. Without hearing argument, the court explicitly denied his motion to exclude the evidence, stating that "[a]ll of these matters are arguments that the defense can raise on cross-examination," and Parvin's assertions simply "go to the weight of the evidence and the credibility of the witnesses."

¶19. Lastly, Parvin himself attempted to object during Dr. Hayne's testimony, but was not allowed to do so. While his attorney was cross-examining Hayne about the accuracy of the autopsy, the following exchange occurred:

Parvin: Your Honor, I am concerned that this expert –

9

Court: I am concerned, sir – if you have anything to say to the Court, you direct it through your attorney. Now, [defense counsel], take him out into the hallway and explain things.

When Parvin and his attorney returned, the trial judge told defense counsel to "inform [Parvin] that if he has any remarks to make to the Court, that he make them to you and you will make them to the Court."

¶20. The trial court was presented with this issue again, when, after Hayne was dismissed, Parvin's attorney moved to strike his testimony as speculative and inflammatory. Additionally, the reliability of Hayne's testimony was reasserted, in detail, in Parvin's *pro se* motion for a new trial and in an amended motion for a new trial filed by his newly-retained appellate counsel. Both motions were considered and denied by the trial court.

¶21. Given the numerous attempts to exclude Dr. Hayne's testimony, we cannot agree with the State that the issue is procedurally barred. The trial judge was given several opportunities to consider the reliability of the autopsy report, and he rejected each one.

### *The Pathologist's Distance and Trajectory Measurements*

¶22. Dr. Hayne's autopsy report listed Joyce Parvin's cause of death as a "shotgun wound of the right flank, distant (approximately 4 feet)." The report also concluded that the "angles of trajectory [were] right to left, superior to inferior at approximately 25-30 degrees and posterior to anterior at approximately 15 degrees." It described the entrance wound as "ovoid and cookie cutter," and noted that there was gun powder tattooing on the victim's face, her left armpit, and in the bend of her left elbow.

10

¶23.    At trial, Hayne testified that the victim had suffered a "near contact wound," but maintained that the distance from the muzzle to the victim was "approximately four feet." He testified that this conclusion was based on the appearance of the entrance wound and the presence of gunpowder "tattooing." Although Dr. Hayne said that he did not know what type of gun was used, his "impression" was that a 12-gauge shotgun, with a bore of approximately three-fourths of an inch, had caused the injury. He further testified at trial, that when fired, "individual pellet strikes start appearing after four feet." This pronouncement was not limited to any particular type, make, or model of shotgun, including the one that inflicted the fatal wound, and neither was it restricted to any kind of barrel choke or length, or type of ammunition.[7] According to Hayne, he was able to discern from the "cookie cutter" shape of the wound that the shot pellets were "right on the verge of separating," thus indicating to him that the muzzle of the gun had been approximately four feet from the victim when the fatal shot was fired. Notably, the autopsy report did not include his conjectures regarding the measurement of the shotgun bore, or his opinion that the pellets were "right on the verge of separating."

¶24.    This testimony was substantially contradicted by Starks Hathcock, the State's firearms expert, who actually had tested the gun in question but was unable to establish a conclusive shot distance. Hathcock was qualified as an expert "in the field of forensic science,

---

[7] It is not suggested that Dr. Hayne *should* have been testifying about such variables, given that he was neither tendered, qualified, nor accepted as an expert on firearms, ballistics, ammunition, or crime-scene investigation.

particularly in firearm and toolmark determinations, and also qualified in the subfield of distance determination, that is, determining distances from the muzzle of a gun to a victim at the time of a shooting." Hathcock explained that, following established and widely accepted testing procedures, he test fired Parvin's gun at various distances and then compared the patterns created in the test cloth and cardboard to the pattern on the victim's shirt. Throughout his testimony, Hathcock used the term "fliers" to describe individual pellets which had separated from "the main mass of shot." Based on his test shots, Hathcock noted that, at four feet, fliers consistently were present, but it was also likely that fliers would appear at anywhere from three to five feet. He also testified that he had observed no fliers in the shirt Joyce Parvin was wearing. According to Hathcock, the testing procedure complied with the generally accepted methods used by forensic firearms experts, and he identified authoritative publications which supported and explained these methodologies.

¶25. As for Hayne's estimated trajectory estimates (25 to 30 degrees downward and 15 degrees forward), he explained his methodology as follows: "[Y]ou place an individual in what's called the anatomically correct position, that is an individual standing, legs together, hands to the side, palms forward, face forward, and then you measure everything in relationship to that posture." When asked to elaborate, Dr. Hayne said he had used a protractor, which he placed at the wound site, to determine the angles. This testimony was compromised, if not contradicted, on cross-examination, when he testified that, unlike a single bullet, the individual pellets would diverge upon impact and that it would be impossible to give the "wound trajectory" for each pellet. Additionally, he said that he

12

sometimes places rods in a wound track to determine trajectory; but, in his opinion, "this case was straightforward."

¶26. Over the defendant's objection, the prosecutor elicited testimony from Dr. Hayne that the 25-to-30 degree downward trajectory was consistent with the barrel's pointing downward toward the victim in a seated or standing position. During this questioning, the prosecutor was holding the shotgun in a firing position, with the gun's butt against his shoulder. Defense counsel argued that this testimony was similar to that given by Dr. Hayne in another murder case, testimony that this Court found to be speculative and improper. *Edmonds v. State*, 955 So. 2d 787, 792-93 (Miss. 2007). The trial court overruled the objection and refused to strike the testimony, finding *Edmonds* distinguishable. At the conclusion of his direct testimony, the prosecutor asked Dr. Hayne whether he had "testified to [his] approximate distance and angles in this case within a reasonable degree of medical certainty," to which he responded "yes."

### The Computer-Generated Re-creation of the Shooting

¶27. Graham, accepted as an expert in crime-scene reconstruction, testified that he had used computer software to reconstruct the scene of the incident digitally or to "pose a hypothesis or an idea as to how maybe the incident happened." According to Graham, the software would create three-dimensional images of human figures and would position those figures based on data he provided. He testified that he used the distance and trajectory estimates from Dr. Hayne's autopsy report, the gun's measurements, Parvin's height as listed on his driver's license, and other measurements taken by the investigating officers at the

13

Parvin home. He did not, however, use any information from Hathcock. Additionally, although there were no measurements regarding Joyce's position after she had been shot, Graham concluded that "the best approximation of the victim's position is consistent with her being seated in the office type chair, body oriented in a southwesterly direction approximately centered on the desk, in a general turned and facing right position, leaning approximately seven degrees to the right."

¶28. This information was used to recreate images depicting Graham's theory of how Joyce was shot. Graham described this theory as "the best approximation based upon all of the data and how all of the angles and all of the measurements fit together into one scenario," and that all the possible scenarios were consistent with the State's theory that Parvin had stood over his wife with the butt of the gun resting on his shoulder. This computer-generated model of Graham's "best possible scenario" consisted of several three-dimensional images showing Graham's theory of the shooting from various vantage points. These pictures, displayed to the jury during Graham's testimony, showed a woman seated in a chair with her face turned toward the muzzle of a gun. The gun was depicted as being held by a man, standing above the woman and looking down at her with the butt of the gun against his shoulder.

### *The Legal Validity of these Expert Opinions*

¶29. After a thorough review of the record, we find that the measurements provided by Hayne and the shooting's depiction by Graham fell woefully short of the requirements for admissibility. M.R.E. 702. When asked to explain how he had calculated his distance and trajectory measurements, Hayne did not cite any scientific principle or method. He asserted

14

that he could measure the trajectory of the shotgun pellets using only his naked-eye observations of the entrance wound and a protractor, despite his testimony that it would be "impossible" to track the fired pellets. The only explanation offered was his assertion that "this case was straightforward."

¶30.    As for the distance determination, Hayne claimed to know that the pellets were "right on the verge of separating," and made an unsupported statement that, when fired, "individual pellet strikes start appearing after four feet," no matter the type of ammunition or shotgun. Despite the conflicting testimony from the State's firearms expert that a conclusive muzzle-to-wound distance could not be determined, Hayne claimed to have been able to measure the distance by viewing the wound and the victim's clothing. In sum, the only scientific method or principle appearing in the record was the *ipse dixit* or self-proclaimed accuracy of Hayne. Because the distance and trajectory measurements were based upon the subjective beliefs and speculation of the testifying witness, his unsupported opinions should have been excluded. *Dedeaux Utility Co., Inc. v. City of Gulfport*, 63 So. 3d 514, 530-31 (Miss. 2011) (citing *Gulf South Pipeline Co. v. Pitre,* 35 So. 3d 494, 499 (Miss. 2010); *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 149 (Miss. 2008); *Edmonds v. State,* 955 So. 2d 787, 792 (Miss. 2007); *McLemore,* 863 So. 2d at 36).

¶31.    Likewise, Graham's graphic depiction of relevant, disputed events was inherently tainted because it relied on the unsupported and admittedly "approximate" measurements from the autopsy as well as Graham's own "best approximation of the victim's position." Graham testified with no degree of certainty regarding the accuracy of his theory as to how

15

the shooting occurred, and he merely asserted that it was his "best approximation" of "a hypothesis or an idea of how maybe the incident happened." *See West*, 553 So. 2d at 20 (expert opinions are not admissible if "expressed in terms of mere possibilities").

¶32.   This "possible scenario" of how the shooting had occurred was presented to the jury by means of computer-generated images accompanied by Graham's testimonial commentary. The jury saw a graphic depiction of the State's theory of the alleged homicide in which a man was standing over a woman aiming a shotgun at her face. The male figure was looking down at the woman, with the butt of the gun on his shoulder, as she stared into its muzzle. Dr. Hayne gave credence to Graham's depiction of the shooting when, as the prosecutor held the weapon and aimed it downward, he opined that the autopsy measurements were consistent with the defendant's standing and aiming the gun at his wife.

¶33.   As with other expert opinions, computer-generated re-creations which graphically depict disputed evidence "*must* be based on scientific, identifiable, and objective facts." *Cox v. State*, 849 So. 2d 1257, 1273-74 (Miss. 2003) (emphasis in original) (citing *Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528 (2000); *State v. Farner*, 66 S.W.3d 188 (Tenn. 2001); *Pierce v. State*, 718 So. 2d 806 (Fla. Dist. Ct. App.1997)). Furthermore, any computer animation that is not based on accurate data or "actual, physical measurements" from the scene of the incident is mere speculation, *Cox*, 849 So. 2d at 1273, for expert opinions are not admissible if "expressed in terms of mere possibilities," *West*, 553 So. 2d at 20. In the present case, the speculative "expert" opinions and the accompanying computer-generated depictions of a "possible" account of the shooting should not have been

16

placed before the jury.  *West*, 553 So. 2d at 20.  As this constituted the main evidence utilized to undermine Parvin's defense, reversal is required.

**II.**

¶34.   Without the inadmissible expert opinions to establish that Parvin intentionally had shot his wife, he argues that he is entitled to an acquittal under *Weathersby v. State*, 265 Miss. 207, 209, 147 So. 481, 482 (1933) .  In 1933, the Mississippi Supreme Court declared:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Id.*  If the *Weathersby* rule applies "and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994) (citing *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)).  There are, however, limitations upon the familiar *Weathersby* rule.  For example, it is inapplicable when the defendant's "conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Green*, 631 So. 2d at 174 (citing *Blanks,* 547 So. 2d at 33).

¶35.   We find that Parvin cannot successfully invoke the *Weathersby* rule, given the testimony by his mistress.  As recounted above, she testified that Parvin initially told her that Joyce had committed suicide.  Sometime later, he admitted that he had lied about the manner of his wife's death and told his paramour that the shooting had been an accident.  Because Parvin's claim that his wife had taken her own life contradicted his assertion that he  had shot

her accidentally, we find that Parvin is not entitled to a judgment of acquittal under *Weathersby*.

*Conclusion*

¶36.   We hold that the circuit court erred in allowing Graham's reconstruction of the shooting to be shown to the jury, because its creation relied on the pathologist's approximation of relevant angles and distances and failed to take into account the testing performed by the firearms examiner.  The State failed to demonstrate the scientific reliability of this speculative testimony, which was highly prejudicial to Parvin's defense.  As this testimony and the computer-generated images illustrating it comprised a very significant part of the State's case, the conviction must be reversed.  Additionally, we find that the defendant is not entitled to an acquittal based on the *Weathersby* rule due to his highly inconsistent statements following his wife's death.  Accordingly, the defendant's murder conviction and sentence are reversed, and the case is remanded to the Circuit Court of Monroe County for a new trial consistent with this decision.

¶37.   **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, PIERCE, KING AND COLEMAN, JJ., CONCUR.  CHANDLER, J., NOT PARTICIPATING.**