# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01813-COA

LORENZO HULL                                                                  APPELLANT

v.

STATE OF MISSISSIPPI                                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/02/2013 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF DEPRAVED-HEART MURDER AND SENTENCED TO THIRTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION |
| DISPOSITION: | AFFIRMED IN PART, VACATED AND REMANDED IN PART - 03/17/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND ISHEE, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     After a four-day trial, a Warren County jury convicted Lorenzo Hull of depraved-heart murder. He was sentenced to thirty-five years in the custody of the Mississippi Department of Corrections (MDOC) as a habitual offender. He now appeals, raising several issues. Hull

claims the trial court erred by permitting the State's expert witness in forensic pathology to give speculative testimony, refusing to redact the victim's death certificate to remove prejudicial hearsay, refusing two jury instructions, and sentencing him as a habitual offender. Hull also argues the weight and sufficiency of the evidence were inadequate to support the verdict. This Court affirms Hull's conviction but vacates his habitual-offender status because the State failed to offer competent evidence that Hull was a habitual offender. We remand the case to the Warren County Circuit Court for resentencing of Hull as a nonhabitual offender.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

¶2. On the morning of December 5, 2011, Hull called 911 at approximately 7:30 a.m. after he awoke to find his girlfriend, Angela Andrews, unresponsive and hot, with red eyes and mucus coming from her mouth and nose. Hull told dispatchers he and Andrews got into a "little fight" and "things got out of hand." The evening before, the couple had argued over "money for grocery bills" and Andrews's alleged recent infidelity. Hull admitted the argument became physical, and he initiated it by slapping her a few times. He also admitted to "probably backhanding" Andrews with a closed fist a few times as well, but denied punching her. Hull is six feet tall and weighed 230 pounds, with admittedly "heavy hands." Andrews was five feet seven inches tall and weighed 171 pounds. Andrews later died from subdural hematoma, or bleeding into the brain, caused by blunt force trauma, at the University of Mississippi Medical Center (UMMC) in Jackson, Mississippi.

¶3. Hull had been living with Andrews at her home in Warren County, Mississippi, for approximately one year. Andrews, a military veteran, was a habitual crack cocaine user and

2

suffered from seizures for which she was prescribed medication. Hull explained he helped Andrews keep up with her medication and made sure her bills were paid. Andrews gave Hull a portion of her check each month to use for bills.

¶4. On December 1, 2011, Hull and Andrews began arguing over money. Andrews wanted to go smoke crack, and Hull eventually "let her run off for a little while . . . and do her thing." Andrews was gone for three days, staying at crack houses, while Hull used "powder" (cocaine) during this same time, sleeping at a friend's house and Andrews's house alone. Andrews returned home on December 4, when their fight ensued.

¶5. Hull maintained that near the end of the altercation, Andrews ran out of the front door trying to escape his assault, missed a step, and fell down the front porch stairs, hitting her head on concrete stepping stones. Hull helped Andrews up, but she came into the house "still frisky." Andrews "gestured" at Hull, so he backhanded her with his fist on the side of her face. She fell and hit her head on the floor. He helped her up, but she was "wobbling [and] staggering." He only noticed a scratch on the side of her face. Hull claimed he then helped Andrews take a bath because she was muddy. During the bath, Andrews was "moaning like she was crying," but never spoke. Hull helped her onto a mattress on the floor, while he slept on a couch in the same room. They went to sleep at about 8:30 p.m. He claimed Andrews never spoke after she fell, but she did turn over and snore during the night. He did not think she was seriously injured.

¶6. After Andrews was taken to a regional hospital by ambulance, Hull was questioned by the Warren County Sheriff's Office and taken into custody. Later that day, when Andrews died at UMMC, Hull was charged with depraved-heart murder. In May 2012, Hull

3

was indicted for depraved-heart murder as a habitual offender under Mississippi Code Annotated section 99-19-81 (Supp. 2014) due to two prior cocaine convictions in 1993 and 2002.

¶7.    At Hull's trial in September 2013, six witnesses testified for the State.  An EMT dispatched to the scene found Andrews unresponsive, on a mattress on the floor.  Her heartbeat was weak, and the EMTs intubated and "worked on her" for twenty to twenty-five minutes without improvement.  During this time, the EMT testified that Hull stated, "I think I messed up this time."  Andrews was "near death" when she arrived at the local hospital, and was airlifted to UMMC in Jackson, where she died at 3:34 p.m. on December 5, 2011.

¶8.    That same day, Hull was interviewed by Sam Winchester, a detective with the Warren County Sheriff's Office, at 10:00 a.m., and again on December 6, after he found out Andrews had died.  Portions of both interviews were entered into evidence at trial and played for the jury during Officer Winchester's examination.  In the first interview, Hull told Officer Winchester that he had gotten "high all night" and admitted, "I f***ed up, bro.  I probably hit her too much."  However, he claimed that he only hit Andrews on her face with open hands, and did not know how badly she was injured when he lay her down on the mattress for bed.

¶9.    During the second interview, after Hull had been charged with depraved-heart murder, he could not remember how many times he hit Andrews, but he maintained that he did not beat her until she died.  He did show Officer Winchester his hands, which he stated were swollen from beating her, but he did not use any other weapons.  He also stated that Andrews had been cheating on him, and he had an "anger problem."

4

¶10. Before the Warren County Coroner testified, a hearing was held outside the jury's presence on Hull's motion to redact a portion of Andrews's death certificate that stated "[s]ubject struck in head" as the means of Andrews's injury.[1] The trial judge denied the motion and ruled the death certificate was admissible because it was an official state record, and Hull could cross-examine the coroner concerning it. Over the defense's objection of hearsay, the State was allowed to introduce Andrews's certified death certificate.

¶11. Dr. Erin Barnhart was accepted as an expert forensic pathologist for the State, and is the State's deputy chief medical examiner. During the autopsy, injuries found on Andrews's body included multiple abrasions and contusions, a scalp hemorrhage, a subdural hematoma on the left side, a subarachnoid hemorrhage, subdural contusions (bruising) on the brain itself, and swelling of the brain. Approximately 150 milliliters of blood and blood clot were found within her cranial cavity. She testified that Andrews's injuries were consistent with being hit by a fist, with multiple impacts of "significant force," and Hull's account of a fall down the steps was impossible. Dr. Barnhart testified the abrasion on Andrews's face could have been sustained by a blow with a fist, whereas a fall would have created a more significant laceration, and not an abrasion. Andrews's use of crack would not have caused or impacted her brain injuries. Finally, Dr. Barnhart testified that people are known to survive subdural hematomas if given immediate medical attention. She testified the cause

---

[1] Prior to trial, Hull had made an oral motion in limine to exclude this statement. The State planned to introduce Andrews's certified death certificate through the testimony of the county coroner. Hull argued the coroner had no prior knowledge of how Andrews's injury occurred. The trial judge reserved ruling until the State attempted to introduce the death certificate at trial.

of Andrews's death was "blunt force trauma," and the manner of death was "homicide," as stated on Andrews's death certificate.

¶12.   Hull testified on his own behalf.  He gave his version of the events, related above.  He admitted he "slapped her around pretty good" and "probably did hit her hard but not with the intention [of] killing her."  He admitted he was high on cocaine during the fight – "a two or three hundred dollar high."  During cross-examination, the prosecution noted Hull told the 911 operator once, and Officer Winchester three times, that "things got out of hand last night."  It was also noted that in Hull's statement he said, "I tried to do the right thing [by calling 911,] but it cost me my freedom."  Hull told the jury that he had a "kind," and not a "depraved," heart.

¶13.   The jury was instructed on depraved-heart murder, culpable-negligence manslaughter, and heat-of-passion manslaughter.  The trial court denied Hull's instructions on misdemeanor manslaughter and excusable homicide by accident or misfortune.  The jury convicted Hull of depraved-heart murder, and the trial judge sentenced him to thirty-five years as a habitual offender under the custody of the MDOC.  Hull's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial was denied.  Hull timely appealed.

## ANALYSIS

### 1.   Expert Witness Testimony

¶14.   Hull claims the trial court erred in permitting the State's expert witness, forensic pathologist Dr. Barnhart, to give her "speculative opinion" that Andrews's injuries were inconsistent with Hull's version of the events. Hull claims that Andrews fell down four steps outside of her house and hit her head on concrete stepping stones, causing her head abrasion

6

and the traumatic brain injury. Dr. Barnhart, who performed Andrews's autopsy, testified that Andrews's injuries were inconsistent with Hull's version of the events.

¶15. On appeal, errors in the admission of evidence, including expert testimony, are reviewed for an abuse of discretion. *Parvin v. State*, 113 So. 3d 1243, 1246 (¶12) (Miss. 2013). Unless the trial court's discretion is found arbitrary and clearly erroneous, the decision will stand. *Galloway v. State*, 122 So. 3d 614, 632 (¶27) (Miss. 2013). Expert testimony is governed by Mississippi Rule of Evidence 702, which states that a properly qualified witness may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The opinions given "must rise above mere speculation" and "be [found] relevant and reliable." *Parvin*, 113 So. 3d at 1247 (¶14) (quoting *Williams v. State*, 35 So. 3d 480, 486 (¶19) (Miss. 2010)); *Ross v. State*, 954 So. 2d 968, 996 (¶57) (Miss. 2007). "Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue." *Ross*, 954 So. 2d at 996 (¶57). Testimony is reliable if it is "based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation." *Id.*

¶16. Dr. Barnhart testified about the injuries found on Andrews's body. Regarding the facial abrasion, she testified that there was no specific way medically to determine how this wound occurred; however, it could have been sustained by a blow from the fist, and this type of blow was consistent with blunt force trauma. Over the defense's objection, when asked whether Andrews allegedly falling and hitting her head on concrete could have caused the abrasion, Dr. Barnhart testified:

7

> If someone had fallen onto a concrete rock I would expect there to be a significant laceration or cut at the area of impact. . . . [W]e generally associate falls with injuries to the [palms] of the hands when someone reaches out to catch themselves. We associate them with injuries to the chin frequently or to the knee caps as someone hits the ground.

However, she stated those types of injuries were not found on Andrews's body. Regarding the subdural hematoma, Dr. Barnhart could not give an exact amount of force needed to create that type of brain injury, but stated it would certainly take "significant force." Dr. Barnhart also testified that a person would be able to walk and talk for "a brief period of time" or "a few minutes" after suffering a subdural hematoma.

¶17. Hull takes issue with the above opinions, claiming they are too speculative, and thus inadmissible under Rule 702. Also, he claims the opinions are more prejudicial than probative, thereby rendering them inadmissible under Mississippi Rule of Evidence 403. Hull cites *Parvin* as analogous, where the Mississippi Supreme Court reversed and remanded the defendant's conviction for murder in part because the expert testimony from the forensic pathologist was found inadmissible. *Parvin*, 113 So. 3d at 1250 (¶29). The defendant was accused of murdering his wife; however, he claimed it was accidental – he was running out of his house with a loaded shotgun to shoot a beaver when he tripped and fell, discharging the gun and accidentally shooting his wife. *Id.* at 1245 (¶3). Dr. Stephen Hayne, who performed the autopsy, testified about firearm distance and trajectory measurements. *Id.* at 1248-50 (¶¶22-26). However, his testimony was contradicted on cross-examination, and also by the State's firearm expert witness. *Id.* at 1249 (¶¶24-25). The supreme court explained that Dr. Hayne did not cite any scientific principle or method for calculating the distance and trajectory measurements of the gunshot wound; instead, he used his naked eye and a

8

protractor, which "fell woefully short of the requirements" of Rule 702. *Id.* at 1250 (¶29).

¶18.    *Parvin* is distinguishable.  Here, the testimony at issue did not involve the more precise subject of gunshot distances and trajectories, as in *Parvin*, but wounds and their possible means of infliction, which is admissible.  The Mississippi Supreme Court has pronounced:  "A forensic pathologist may also testify about 'wounds, suffering, and the means of infliction of injury,' since it falls within his or her area of expertise," as well as "whether a particular instrument or weapon in evidence was consistent with particular injuries to a victim."  *Galloway*, 122 So. 3d at 632 (¶29) (citations omitted).  Dr. Barnhart gave her expert opinion on the possible cause of Andrews's wounds based upon her personal observation of her external and internal wounds while performing the autopsy, which is proper.  It was her opinion the injuries she observed and examined were inconsistent with a fall, as Hull claimed.

¶19.    The trial court did not err in allowing Dr. Barnhart's testimony on Andrews's injuries.

## 2.    Death Certificate Redaction

¶20.    Hull states the trial court erred in refusing to redact Andrews's certified death certificate to exclude the statement "subject struck in head" in answering the query "how or by what means injury occurred."  Hull argues this statement was inadmissible "hearsay within hearsay" under Mississippi Rule of Evidence 805, as well as more prejudicial than probative under Rule 403.  Additionally, he argues the failure to redact the death certificate violated his right to confrontation under the Sixth Amendment.  We shall discuss each argument in turn.

### *Hearsay*

9

¶21. Hull objected twice to the admission of the statement in the death certificate – before trial in a motion in limine, when the trial court reserved ruling until trial; and at trial prior to the coroner's testimony, when it was going to be introduced. The trial court allowed the certificate into evidence without redaction because it was an official record of the Mississippi Department of Health and Vital Records on file at that facility.

¶22. "The standard of review regarding admission or exclusion of evidence is abuse of discretion." *Ladnier v. State*, 878 So. 2d 926, 933 (¶27) (Miss. 2004). The reviewing court "will not reverse unless the error adversely affects a substantial right of a party." *Id.* Mississippi Rule of Evidence 803(9) provides a hearsay exception for records of vital statistics, which would include properly certified death certificates. *See* Miss. Code Ann. § 41-57-1 (Rev. 2013); *Shell v. State*, 554 So. 2d 887, 898 (Miss. 1989), *overruled on other grounds by Shell v. Mississippi*, 498 U.S. 1 (1990) ("A death certificate clearly falls under the language of [Rule 803(9)]."). Rule 803(9) provides no exclusions to this hearsay exception. Rule 805 provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule . . . ."

¶23. Hull argues the same distinction as the dissent in *Birkhead v. State*, 57 So. 3d 1223, 1243-44 (¶79) (Miss. 2011): "the death certificate *itself* is excepted from the hearsay rule as a record of a vital statistic"; yet the "*contents* of the death certificate, however, still are subject to the rules of evidence," and Rule 805 would exclude the contents as hearsay within hearsay. *Id.* (Kitchens, J., dissenting) (emphasis in original). In *Birkhead*, the defendant moved for the "time of injury" from the victim's death certificate to be redacted. The

10

supreme court held Rule 803(9) unequivocally provides death certificates are admissible. *Birkhead*, 57 So. 3d at 1232 (¶32). Accordingly, this Court is bound by the rule of *Birkhead*.

¶24. Further, we find that any presumed error was harmless. "[T]he inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether that error was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Id.* at 1232-33 (¶33) (quoting *Thomas v. State*, 711 So. 2d 867, 873 (¶25) (Miss. 1998)). At trial, Hull admitted to slapping Andrews and backhanding her with a closed fist. Near the end of the altercation, he claims she bolted out of the front door, fell down some stairs, and struck her head on concrete stepping stones. Given Hull's own testimony, failure to redact "subject struck in head" from Andrews's death certificate did not prejudice him, and the introduction of this information was not more prejudicial than probative under Rule 403. Hull's own theory of the case was Andrews's died due to being "struck in the head" through impact with a stepping stone. It was an issue for the jury to determine what or who delivered the fatal blow – a stepping stone or Hull.

### Sixth Amendment

¶25. An appellate court reviews a Sixth Amendment Confrontation Clause objection de novo. *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008). The Sixth Amendment prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Evidence admitted through a hearsay exception is still under Confrontation Clause scrutiny. *Birkhead*, 57 So. 3d at 1233 (¶36). "Testimonial" statements include:

11

> [E]x parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 1234 (¶37) (quoting *Crawford*, 541 U.S. at 51-52) (internal quotation marks omitted). "[B]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been *created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial* – they are *not testimonial*." *Id.* at 1234-35 (¶38) (emphasis in original) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)). Accordingly, regarding a death certificate, "should evidence be developed that 'time of injury,' 'cause of death,' and/or other relevant death-certificate entries were included or influenced by police officers or prosecutors with an eye toward prosecution, a trial judge would not be in error for redacting such." *Id*. at 1235 (¶40).

¶26. Hull argues that the investigators provided the coroner with the information on the death certificate "to establish past events with an eye towards trial." He maintains that the coroner had no personal knowledge about how Andrews's injury occurred except from what other people told him, and the State's witnesses did not establish who provided the coroner with this information. Thus, Hull claims his right to confront the unknown witness with this alleged testimonial hearsay was violated.

¶27. We disagree, and again find *Birkhead* instructive. There, the Mississippi Supreme

12

Court held the death certificate was not subject to Confrontation Clause analysis because it was "a nontestimonial record of vital statistics, 'created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial.'" *Id.* at 1236 (¶42) (quoting *Melendez-Diaz*, 557 U.S. at 324).[2] We cannot say that Andrews's means of injury was shown on the death certificate as "struck in head" in order to prove a fact at trial. There is no evidence in the record to support this argument. Further, the physician performing the autopsy testified at trial and was confronted by Hull during cross-examination. While she may not have actually filled out the death certificate, she did not dispute its information. As the State points out, it was an issue for the jury to determine whether Andrews was struck in the head by impact with a stepping stone after falling down the stairs, or by Hull's hands.

### 3.   Sufficiency and Weight of Evidence

¶28.   Hull argues the sufficiency and weight of the evidence were inadequate to convict him of murder. At the most, Hull contends he should be guilty of culpable-negligence or heat-of-passion manslaughter. Hull requests the Court reverse his conviction for murder and remand the case for a new trial, or remand the case for resentencing as a nonhabitual offender for manslaughter under the direct-remand rule.[3]

---

[2] The supreme court noted, however, that it did not hold that testimonial statements, subject to the Confrontation Clause, could never be found in nontestimonial business or public records. *Birkhead*, 57 So. 3d at 1236 (¶42).

[3] "Utilizing the direct-remand rule, an appellate court may remand a case to the trial court for sentencing on a lesser-included offense where the greater offense was not proved, but the elements of the lesser-included offense were sufficiently met." *Snowden v. State*, 131 So. 3d 1251, 1259 (¶22) (Miss. Ct. App. 2014) (citing *Shields v. State*, 722 So. 2d 584, 587 (¶7) (Miss. 1998)).

¶29.    In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nolan v. State*, 61 So. 3d 887, 893 (¶24) (Miss. 2011) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005)).  The verdict will be affirmed if "reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense." *Id.*  All credible evidence consistent with the defendant's guilt will be accepted as true, together with all favorable inferences that may be reasonably drawn from the evidence. *Robinson v. State*, 940 So. 2d 235, 240 (¶13) (Miss. 2006) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).  The evidence will be considered in the "light most favorable to the State." *Id.*

¶30.    Regarding the weight of the evidence, the appellate court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18).  The evidence will be considered in the light most favorable to the verdict. *Id.*  It is the role of the jury to assess the weight and credibility of the evidence and to resolve any conflicts in the evidence. *Latiker v. State*, 918 So. 2d 68, 73 (¶12) (Miss. 2005).

¶31.    Hull argues that he acted with a degree of recklessness that rose to the level of culpable-negligence manslaughter, but not depraved-heart murder, which is defined as a killing "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ."  Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014).

14

A defendant is guilty of culpable-negligence manslaughter if he or she kills another through "negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and this shall be so clearly evidenced as to place it beyond every reasonable doubt." *Jones v. State*, 678 So. 2d 707, 710-11 (Miss. 1996). Second, Hull argues that he could only at most be guilty of heat-of-passion manslaughter, which is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2014). "Heat of passion" has been defined as: "A state of violent and uncontrollable rage engendered by a blow or certain other provocation given . . . ." *Nolan*, 61 So. 3d at 893 (¶26) (quoting *Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996)). In contrast, "depraved-heart murder involves a higher degree of recklessness from which malice or deliberate design may be implied." *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992). "Whether a homicide is classified as a murder or manslaughter is ordinarily an inquiry to be made by the jury." *Moore v. State*, 52 So. 3d 339, 347 (¶32) (Miss. 2010).

¶32. Hull claims that Andrews's death resulted from delay in getting her medical attention, whether the jury believes she fell down the stairs and hit her head or he struck her, and this delay shows culpable negligence, not murder. Further, Hull claims he did not intend to kill Andrews. Yet, regardless of his intent, the evidence showed Hull caused Andrews's injuries, whether by his fist or by the stairs when she attempted to flee from his attack, and her injuries were severe enough to cause her death. The fact that he could have gotten her medical attention sooner does not mitigate the fact that he originally caused her deadly injury. Even

15

though Hull was angry when he slapped Andrews, the jury rejected any "heat-of-passion" theory after being properly instructed.

¶33. Further, there was sufficient evidence presented of malicious intent to convict Hull of depraved-heart murder. Hull admitted that he and Andrews had been arguing for several days. When she returned home the evening at issue after going on a crack binge, they fought over money, and he initiated the physical fight by slapping her a few times. At trial, he stated, "I slapped her around pretty good, yes, I did." He also admitted to backhanding her with a closed fist a few times, and that he had heavy hands. While working on Andrews, an EMT overheard Hull say he probably "messed up this time." During his police interview, Hull showed Officer Winchester how his hands were swollen from striking Andrews. He also admitted to Winchester that he had been high all night and "probably hit her too much." After Andrews fell for the last time due to Hull's backhanding her in the face, she was wobbling and staggering. She never spoke again, even after a bath, in which Hull had to assist. According to Dr. Barnhart, Andrews's injuries were consistent with being hit by a fist multiple times with significant force. The jury was properly instructed on culpable-negligence manslaughter, heat-of-passion manslaughter, and depraved-heart murder. Viewed in the light most favorable to the State, the evidence shows Hull acted with a degree of recklessness from which malice or deliberate design could be implied for a conviction of depraved-heart murder. Finally, allowing his conviction to stand does not constitute an unconscionable injustice.

### 4. Jury Instructions

¶34. Hull argues the trial court erred in refusing jury instructions D-6 and D-2, which dealt

16

respectively with misdemeanor manslaughter and excusable homicide. The standard of review for the refusal of jury instructions is abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010).

> [T]he instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.

*Id.* at 73-74 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)).

Further, "a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Williams v. State*, 803 So. 2d 1159, 1161 (¶7) (Miss. 2001).

¶35. Hull was granted three jury instructions presenting his theory of the case. Jury instruction D-3 authorized the jury to find Hull guilty of manslaughter if it found he acted without malice in the heat of passion. Jury instruction D-4 allowed the jury to find Hull guilty of manslaughter by culpable negligence if it found he killed Andrews "by hitting her, without authority of law." Finally, jury instruction D-12A stated the jury could find Hull not guilty if it found that "Andrews fell on the steps in the front of her house and hit her head on a concrete brick and that Lorenzo Hull was not the cause of her fall on the steps or the injuries that resulted in her death."

### *Jury Instruction D-6 – Misdemeanor Manslaughter*

17

¶36. Hull claims there was evidentiary support for jury instruction D-6, which stated that the jury could find Hull guilty of misdemeanor manslaughter if it found Hull killed Andrews "without malice and without authority of law . . . while in commission of a simple assault, not amounting to a felony . . . ." *See* Miss. Code Ann. § 97-3-29 (Rev. 2014). Hull argues if the jury believed Hull's theory of defense that Andrews's fatal injury was from falling and hitting her head during the course of simple assault, this jury instruction would be appropriate.

¶37. We disagree. The evidence clearly establishes that Hull's multiple blows with his fist to Andrews's head are sufficient to establish the felony of, at a minimum, aggravated assault, and not misdemeanor assault, regardless of whether the jury found she fell down the stairs and hit her head as well. This instruction was properly given.

### *Jury Instruction D-2 – Excusable Homicide*

¶38. Instruction D-2 stated a killing of another person is excusable when: "committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent," or when "committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation," or when "committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner." *See* Miss. Code Ann. § 97-3-17 (Rev. 2014). Hull concedes that the evidence does not show Andrews's death was due to an accident "by lawful means, with usual and ordinary caution." However, he does claim the jury instruction should have been amended to instruct the jury on the other elements. Hull claims the evidence shows Andrews's fatal injury could have been caused

18

by falling down the stairs and hitting her head fleeing from Hull in the "heat of passion." Alternatively, he argues he and Andrews engaged in striking one another with their bare hands, committing "sudden combat" without weapons.

¶39.   We are not persuaded by either of these arguments.  According to Hull, Andrews ran out of the house to flee his blows and fell down the porch stairs.  If the jury believed this version of events, Hull did not kill Andrews – the fall did – and there was no "homicide"; it was purely an accident.  Further, there was no evidence of a "sudden and sufficient provocation."  Hull and Andrews had been arguing for approximately three days, and in his second police interview, Hull stated the fight at issue lasted approximately twenty to thirty minutes.  Regarding Hull's other point, the evidence does not support an "undue advantage" by Hull because he was a six-foot-tall male weighing 230 pounds, and Andrews was a five-foot seven-inch female weighing 171 pounds.

¶40.   The refusal of these jury instructions was proper and did not deprive Hull of his theory of the case.

### 5.   Habitual-Offender Status

¶41.   Hull argues the trial court committed plain error in sentencing him as a habitual offender without the possibility of parole because the State failed to offer competent proof of his prior convictions into evidence at the sentencing hearing.

¶42.   Hull's indictment alleged he was a habitual offender under section 99-19-81.[4]  The

---

[4] Section 99-19-81 provides:

Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately

19

indictment sets forth Hull's prior convictions, including the offenses, conviction dates, and cause numbers. At the sentencing hearing, the State orally represented that it had certified copies of sentencing orders for Hull's two prior convictions for sale of a controlled substance in 1993 and possession of cocaine in 2002. However, the State did not introduce these documents into evidence or make them a part of the record. Additionally, Hull did not object to being sentenced as a habitual offender at the hearing. The trial court proceeded to sentence Hull as a habitual offender.

¶43. In order to sentence a defendant as a habitual offender, the accused must be properly indicted as a habitual offender, the prosecution must "prove the prior offenses by competent evidence," and the defendant must "be given a reasonable opportunity to challenge the prosecutor's proof." *Grayer v. State*, 120 So. 3d 964, 969 (¶18) (Miss. 2013) (quoting *Keyes v. State*, 549 So. 2d 949, 951 (Miss. 1989)). The judgment of conviction is the best evidence of conviction. *Id.* at (¶19) (citing *McIlwain v. State*, 700 So. 2d 586, 589 (¶13) (Miss. 1997)). Certified copies of pen-packs, indictments, sentencing orders, and commitment papers showing the defendant's prior sentences have also been deemed competent evidence for habitual-sentencing purposes. *Short v. State*, 929 So. 2d 420, 426 (¶16) (Miss. Ct. App. 2006); *Harper v. State*, 887 So. 2d 817, 828 (¶49) (Miss. Ct. App. 2004). "For this Court to affirm an enhanced sentence under 99-19-81, the trial court's basis for imposing the sentence

brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

must appear in the record on appeal." *Short*, 929 So. 2d at 426 (¶17) (citing *Vince v. State*, 844 So. 2d 510, 517 (¶22) (Miss. Ct. App. 2003)).

¶44. The plain-error rule is employed "when a defendant's substantive or fundamental rights are affected. To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule," if the error was "plain, clear, or obvious," and whether the error "prejudiced the outcome of the trial." *Grayer*, 120 So. 3d at 969 (¶15) (internal citations and quotation marks omitted).

¶45. Hull cites *Grayer* as controlling. There, the defendant was indicted for burglary as a habitual offender under section 99-19-81, and later convicted by a jury. *Id.* at 966-67 (¶¶6-7). The indictment clearly set forth his "previous felony convictions . . . , including the offenses, dates convicted, and cause numbers." *Id.* at 967 (¶6). During sentencing, the defendant did not object to being sentenced as a habitual offender, but the record did not contain any evidence to support his habitual-offender status other than the indictment and the State's oral recitation of his previous convictions. *Id.* at (¶8). The Mississippi Supreme Court found the trial court's imposition of habitual-offender status rose to the level of plain error. *Id.* at 970 (¶21). The supreme court found the State failed to prove the defendant's prior offenses by competent evidence, vacated his sentence and habitual-offender status, and remanded the case to the circuit court for resentencing as a nonhabitual offender. *Id.* at (¶22). On remand, the State was not entitled to another chance to prove the defendant's habitual-offender status because that would violate the prohibition against double jeopardy. *Id.* at 969-70 (¶20) (citing *Ellis v. State*, 520 So. 2d 495, 496 (Miss. 1988)).

¶46. We find this case analogous to *Grayer*. Here, the record shows no proof of any

convictions introduced into evidence as exhibits, or otherwise made a part of the record, except Hull's indictment and the State's oral representation at sentencing that it had "two certified as well as attested true copies of convictions." The State argues that because Hull did not object, he is procedurally barred from doing so for the first time on appeal. The State mistakenly cites *Grayer* for this proposition. *See id.* at 968 (¶14). The *Grayer* court did not apply a procedural bar to the defendant's challenge, but found the failure to introduce evidence of the defendant's convictions rose to plain error because defendants have "a fundamental right to be free from an illegal sentence." *Id.* at 969 (¶16).

¶47. The State also supplemented its authorities under Mississippi Rule of Appellate Procedure 28(k), and claimed the recent post-conviction relief case of *Carr v. State*, 2013-CP-01013-COA, 2014 WL 1674152 (Miss. Ct. App. April 29, 2014), was dispositive on this issue. In *Carr*, this Court held that failure of the trial court formally to admit copies of the defendant's two prior felony convictions during sentencing did not amount to plain error. *Id.* at *3 (¶¶11-12). We do not agree. At Carr's sentencing, even though the State moved for copies of the convictions to be admitted into evidence, the trial court never formally admitted them into the record. *Id.* at (¶11). In our case, the State made no such motion.

¶48. We find the State's argument without merit. Hull's sentence as a habitual offender is vacated and remanded for the sole purpose of resentencing Hull as a nonhabitual offender.

## CONCLUSION

¶49. For the foregoing reasons, we affirm Hull's conviction, but remand the case to the Warren County Circuit Court for resentencing of Hull as a nonhabitual offender.

¶50. **THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY OF**

22

**CONVICTION OF DEPRAVED-HEART MURDER IS AFFIRMED. THE SENTENCE OF THIRTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER IS VACATED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WARREN COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**